COMMONWEALTH vs. PAUL CORRIVEAU.

Essex.  September 11, 1985. — December 11, 1985.

Present: HENNESSEY, C.J., LIACOS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Homicide. Constitutional Law,* Waiver of constitutional rights, Search and seizure, Admissions and confessions. *Arrest. Search and Seizure,* Consent, Affidavit. *Probable Cause. Waiver. Evidence,* Admissions and confessions. *Practice, Criminal,* Argument by prosecutor, Instructions to jury.

Evidence at the hearing on a pretrial motion to suppress warranted the judge's determination that a criminal defendant had voluntarily accompanied police officers to a station house for questioning and that he was not in a custodial situation until after a benzidine test revealed the presence of blood on his hands. [326-329]

The record of the hearing on a criminal defendant's motion to suppress evidence revealed no deficiency in the Miranda warnings given him by police and, in any event, the judge was entitled to credit the testimony of an experienced police officer that full Miranda warnings had been given. [329-330]

Where a police officer had informed a criminal defendant of his Miranda rights and the defendant, who was shown by the evidence to have been an experienced and well-educated businessman, thereafter responded affirmatively to the officer's question whether he understood his rights, the judge who heard the defendant's pretrial suppression motion could properly conclude that the defendant had knowingly and voluntarily waived his rights, even in the absence of explicit language of waiver. [330]

A defendant's comment, during police questioning, that "[i]t's beginning to sound like I need a lawyer," did not require the police to cease questioning him until he had consulted an attorney where, after a police officer told the defendant, "You may use the telephone to call a lawyer and you may leave at any time if you wish to do so," the defendant replied, "I don't want to leave and I don't want a lawyer." [331]

A judge could properly conclude that a statement by a police officer to an experienced and well-educated criminal defendant, to the effect that others had spoken to police, did not make the defendant's waiver of his Miranda rights the product of coercion, where the defendant had already observed his friend talking to police on entering the station house. [331-332]

The effectiveness of a criminal defendant's consent to the administration by police of a chemical test designed to reveal the presence of blood on his hands did not depend on whether he had been informed of possible adverse physiological effects of the test. [332-333]

A police officer's affidavit in support of search warrants with respect to a criminal defendant's home, vehicle, and person was not, in the circumstances, rendered misleading by the omission of any reference to two inconsistencies between the actual appearance of the defendant's automobile, which he was driving when stopped by police, and the description of a car observed on the road where a murder victim's body was discovered. [333-335]

At the trial of indictments for murder and for assault with intent to commit rape, the judge's entry of a required finding of not guilty on the charge of assault with intent to commit rape did not preclude the prosecutor from referring in closing argument to the possibility, supported by the evidence, that there had been consensual sexual activity between the defendant and the victim. [335-337]

At a murder trial, the prosecutor's references in closing argument to the results of a benzidine test, which revealed the presence of blood on the defendant's hands; to the defendant's failure to summon aid for the victim, whom he claimed to have discovered badly beaten; and to the victim's conscious suffering were proper in view of the evidence and in view of the Commonwealth's theory that the murder had been committed with extreme atrocity and cruelty. [337-339]

An improper comment on certain evidence in the case by the prosecutor during closing argument at a murder trial did not necessitate a curative instruction by the judge where none was requested, and any possible prejudice was minimized by the judge's subsequent instruction that closing arguments were not evidence. [338]

At a murder trial, improper comments by the prosecutor during closing argument which, in effect, invited the jury to speculate on matters not in evidence, when considered in light of the prosecutor's entire argument and the judge's instructions to the jury, presented no substantial risk of a miscarriage of justice. [339]

At a murder trial, no misstatement of the law appeared either in the judge's instructions to the jury with respect to the probative value of circumstantial evidence or with respect to the appropriateness of their drawing inferences. [339-340]

A defendant who testified at his trial for murder that he had not been at the scene of the crime at the time of the murder was not thereby entitled to a jury instruction concerning alibi, in the absence of a request for such an instruction. [340]

The evidence at a murder trial did not justify a jury instruction on either voluntary or involuntary manslaughter. [340-341]

INDICTMENT found and returned in the Superior Court Department on May 18, 1981.

A pretrial motion to suppress evidence was heard by *Samuel Adams,* J., and the case was tried before *Andrew R. Linscott,* J.

*John J. Jennings* for the defendant.

*Robert J. Bender,* Assistant District Attorney, for the Commonwealth.

O'CONNOR, J. The defendant, Paul N. Corriveau, was indicted for assault with intent to commit rape and for murder in the first degree. At the conclusion of the Commonwealth's case, the judge entered a required finding of not guilty as to the indictment for assault with intent to commit rape. The jury returned a guilty verdict on the charge of murder in the first degree and the judge imposed the mandatory term of life imprisonment.

On appeal, the defendant argues that his conviction should be reversed and a new trial ordered because (1) the motion judge incorrectly denied the defendant's motion to suppress statements made to the police, the results of tests performed on his person and on various articles seized by the police, and other evidence relating to items seized from his home, vehicle, and person; (2) the defendant was unfairly prejudiced by remarks made by the prosecutor during closing argument; (3) the trial judge erred in instructing the jury as to circumstantial evidence; (4) the trial judge failed to give an alibi instruction; and (5) the trial judge refused to instruct the jury on manslaughter. The defendant also argues that he is entitled to relief under G. L. c. 278, § 33E (1984 ed.). We conclude that there is no reversible error and that the defendant is not entitled to relief under § 33E. Accordingly, we affirm the defendant's conviction.

For background purposes, we summarize facts found by the motion judge. During the evening of May 6, 1981, the defendant went to a lounge in Salem, New Hampshire, called the "Lodge." At the Lodge, the defendant and the victim, Priscilla Cabral, were observed dancing together between 11 P.M. and midnight and the two were still together at approximately 1 A.M. Less than twelve hours later the victim's body was discovered approximately one and one-half to two miles from the Lodge, ten to fifteen feet from Nevins Road in Methuen.

The victim's face and head had been severely beaten, and the victim's face was completely covered with blood. The brown corduroy jacket worn by the victim was torn and the victim was naked from the waist down. A short distance from the victim's body, the police discovered a piece of a dental plate in a blood soaked indentation in the ground. The local medical examiner estimated the time of death as the early morning hours of May 7, 1981.

1. *Motion to Suppress.*

Prior to his trial, the defendant moved to suppress "any and all physical evidence, tests (scientific or otherwise) performed upon his person and upon various articles seized by law enforcement authorities, and various articles seized by law enforcement authorities, observations made of said various articles seized by law enforcement authorities, and statements made by him," as well as any evidence that was the fruit thereof. After an evidentiary hearing, the judge denied the motion. On appeal, the defendant advances several arguments in support of his position that his motion should have been granted. We shall consider each argument in turn. There was no error.

In a detailed memorandum, the motion judge made the following findings relevant to the motion to dismiss. On May 7, 1981, after the discovery of the victim's body, Methuen police Officer Shea Baddour interviewed Gene McEvoy of Methuen. McEvoy stated that on the morning of May 7, 1981, at approximately 1:30, he had observed a motor vehicle on Nevins Road where the victim's body was discovered. McEvoy described the vehicle as dark colored, expensive, possibly a Lincoln or a Cadillac automobile, with a square front chrome grill. On May 7, the police were aware that the defendant owned a Lincoln Continental.

By 7 P.M. on May 7, the homicide investigation had focused on the defendant. During the evening hours of that day Methuen police Officers Richard True and Albert Ange made several trips past the defendant's Lawrence residence in an unmarked cruiser. That night at approximately 10:15, the officers observed the defendant's Lincoln Continental stop in front of his house for about two minutes while his wife got out of the car.

The defendant then proceeded toward Methuen and the officers followed him. At a point eighty to one hundred feet inside the Lawrence-Methuen line, the officers activated a flashing blue light concealed in the grill of the cruiser and caused the defendant to pull his vehicle to the side of the road. After the stop but before approaching the defendant's automobile, the officers radioed the Methuen police station to say that they had stopped the defendant.

After the defendant brought his vehicle to a stop, the defendant and the officers got out of their respective vehicles and walked toward each other. As the defendant and the officers approached each other, one of the officers said, "Paul, would you mind coming back to the station with us?" The defendant responded, "Sure." At the suggestion of the officers, the defendant moved his vehicle to the side of the road, shut off the engine, and locked the doors. After the defendant secured his automobile, an officer opened a door of the two-door cruiser and the defendant got into the back seat alone. The cruiser then proceeded to the Methuen police station. The motion judge concluded that, even though it could be inferred that the officers followed the defendant into Methuen in order to be in a position to take the defendant into custody if he refused to go to the police station voluntarily, the defendant did in fact voluntarily accompany the officers to the police station.

On several occasions prior to getting into the cruiser and on the way to the station, the defendant asked the officers why they wanted to see him at the police station. The officers responded to each inquiry by saying that Captain O'Rourke would explain the situation when they arrived at the station. At the station the defendant was led to the station's interrogation room, where the defendant waited with a Methuen policeman for the arrival of the officers in charge of the murder investigation. After a few minutes, Methuen police Captain Hugh O'Rourke and State police Detective Lieutenant John Burns and Lieutenant Alfred Duemling entered the room and greeted the defendant. Lieutenant Duemling thanked the defendant for coming to the station, introduced himself and Lieutenant Burns,

and said, "You probably know Captain O'Rourke." During the introductions, one of the officers observed the defendant's hands and detected no marks on them.

After the introductions were completed, Lieutenant Duemling informed the defendant that the police were investigating the homicide of a young female. Lieutenant Duemling then asked the defendant, "Do you have any objection to answering a few questions?" and the defendant replied, "No." The police then told the defendant the name of the victim and the defendant responded, "Oh my God, I was with her last night." Before asking the defendant any further questions, Lieutenant Duemling informed the defendant of his Miranda rights. At this point, the defendant said, "It's beginning to sound like I need a lawyer." Captain O'Rourke then said to the defendant, "You may use the telephone to call a lawyer and you may leave at any time if you wish to do so." The defendant replied, "I don't want to leave and I don't want a lawyer."

The defendant then gave the following information to the police. The defendant stated that he had arrived at the Lodge at approximately 10:30 P.M. on May 6, 1981. After some small talk with friends he observed the victim enter the Lodge. They had a couple of drinks together. He and the victim danced together and they both left the Lodge at approximately 1:05 A.M. He had a discussion with the victim about his new Mark V Lincoln, and he asked her if she wanted to see it. While she sat on the passenger side, he started the motor so she could observe the dashboard and the car's other features. After about two minutes, she left the motor vehicle and, although he did not see her go to her car, he assumed that she did. He left the parking lot, drove to his home, which is approximately ten minutes away, and arrived home at approximately 1:30 A.M. At that time he spoke to his wife, who was awake. In addition to this statement, the defendant informed the police that he was wearing black pants and a black shirt on the evening of May 6, 1981.

At some point while the defendant was speaking to the police, the judge found, the police towed the defendant's automobile to the station without his permission. During the

course of the questioning the defendant was asked to sign a permission slip authorizing the police to search his vehicle, and the defendant signed the slip. The permission slip was not produced by the Methuen police and apparently has been lost. The defendant's vehicle was not searched under the authority of the permission slip, however. The vehicle was searched pursuant to a search warrant obtained later in the evening.

After the defendant related his account of the events that had transpired the previous evening, the police asked him if he would submit to a benzidine reagent test. The defendant was informed that the benzidine test was a chemical test which would reveal the presence of blood. The test, the defendant was told, was harmless and would be administered by rubbing a fluid or paper on his hands and wrists. After listening to the description of the test, the defendant indicated that he was willing to take such a test. A State police chemist, who was at the Methuen police station at the time and who earlier in the day had made examinations of the scene of the crime, was then summoned to the interrogation room. At the completion of the test, the chemist informed the defendant that the purplish color appearing on portions of his hands indicated the presence of blood. At this point the defendant stated that he wished to call an attorney and he did so. He stated further that he would not answer any more questions, and he revoked his permission to search his vehicle. The defendant then contacted an attorney who came to the police station. No further questions were put to the defendant, and at approximately midnight the defendant was placed under arrest.

At approximately 11 P.M. the police had summoned a magistrate to the station. After the magistrate arrived, Lieutenant Burns presented three search warrant applications along with copies of an affidavit to the magistrate for his consideration. The applications sought permission to search the defendant's home, vehicle, and person. The magistrate issued the warrants, and shortly thereafter the police seized various articles of evidence including blood scrapings from the defendant's vehicle and a pair of stained shoes from the defendant's house.

In his written decision denying the defendant's motion, the motion judge made several determinations bearing on the defendant's constitutional rights. First, the judge found that the defendant voluntarily had accompanied the police to the Methuen police station and that the defendant was not in a custodial situation until the completion of the benzidine reagent test. Second, he found that, with the exception of the statement, "Oh my God, I was with her last night," all statements made by the defendant were preceded by the issuance of complete Miranda warnings which the defendant understood. The judge found that the defendant voluntarily and knowingly had agreed to answer questions by the police. As to the search warrants, the judge determined that the affidavit of Lieutenant Burns contained sufficient underlying facts and circumstances, with or without the information supplied by the defendant, to support a finding of probable cause by the magistrate.

On appeal, the defendant attacks several of the motion judge's findings and rulings. At the outset we note that, in the absence of clear error, we accept the judge's subsidiary findings. *Commonwealth* v. *Monteiro, ante* 123, 131 (1985). Furthermore, we give substantial deference to the judge's ultimate findings. *Id.* However, "we make our own independent determination on the correctness of the judge's 'application of constitutional principles to the facts as found . . . .' " *Commonwealth* v. *Haas,* 373 Mass. 545, 550 (1977), quoting *Brewer* v. *Williams,* 430 U.S. 387, 403 (1977). After carefully reviewing the judge's subsidiary findings and the record, we conclude that the findings are well supported by the evidence, that there is no cause to disturb the judge's ultimate findings, and that the judge's rulings were correct.

The defendant argues first that his initial encounter with the police and his subsequent journey to the Methuen police station constituted an arrest without probable cause in violation of the United States and Massachusetts Constitutions.[1] According to

---

[1] In this regard, the defendant does not argue that his rights under the State Constitution are greater than his rights under the Fourth Amendment to the United States Constitution.

the defendant, the motion to suppress should have been granted because the arrest was unlawful and thus the taking of his statement at the police station and the subsequent tests, observations, and seizures of various items of evidence from his home, vehicle, and person were unlawful as well. We disagree. There was no constitutional violation because the defendant was not arrested or "seized" within the meaning of the Fourth Amendment until after the completion of the benzidine test.

A determination of when a person has been placed under arrest is governed by an objective standard. *Commonwealth v. Avery,* 365 Mass. 59, 65 (1974). "[A] person has been 'seized' . . . if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Commonwealth* v. *Borges,* 395 Mass. 788, 791 (1985), quoting *United States* v. *Mendenhall,* 446 U.S. 544, 554 (1980). In the present case the motion judge determined that the defendant was not in custody until the benzidine reagent test was completed, and that the defendant voluntarily accompanied the police to the station. A person is not under arrest simply because he complies with a request by the police that he accompany them to the station for questioning. See *Commonwealth v. Slaney,* 350 Mass. 400, 406 (1966) ("[I]t is clear that no illegal detention arises when a person, complying with a request by the police, voluntarily goes to a police station for questioning . . . "). Testing the judge's determination that the defendant was not in custody in light of the totality of the circumstances, *United States* v. *Mendenhall, supra* at 557, we conclude that the determination is well supported by the evidence. The evidence warranted the judge's finding that the defendant was a college graduate and a local businessman, that he was not fearful of the police, that when he was stopped by the police on May 7 he knew that the victim's body had been found and that he had been seen with the victim at the Lodge the night before, and that the defendant wanted to appear to be cooperative with the police. The defendant himself testified that he knew he did not have to accompany the officers to the station and there was evidence, believed by the judge, that during the interrogation Captain

O'Rourke told the defendant that he was free to leave the station. The evidence clearly warranted the judge's conclusion that until the benzidine test was completed the defendant was not in a custodial situation.

"[T]he threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled" are examples of circumstances that might indicate a seizure. *United States* v. *Mendenhall, supra* at 554. There was no evidence in this case, however, that before the completion of the benzidine test the police touched the defendant or in any way used or threatened to use force against him.

The defendant argues that our decision in *Commonwealth* v. *Haas,* 373 Mass. 545 (1977), compels the conclusion that the defendant was illegally arrested by the Methuen police. It is true that there are similarities between *Haas* and the present case, but *Haas* is not controlling because of the significant differences between the two cases. In *Haas* the police told the defendant to go to his home (where the bodies of his wife and children lay), and when the defendant arrived there he was not permitted to enter. Instead, "[a]s Haas ran up the driveway, [a police officer] put his hand around Haas' back and motioned him to get into the police cruiser." *Id.* at 551. The evidence in Haas, unlike the evidence here, compelled the conclusion that the defendant was "deprived of his freedom of action in [a] significant way." *Id.,* quoting *Miranda* v. *Arizona,* 384 U.S. 436, 444 (1966). The fact that the police had focused their investigation on the defendant and desired to speak with him at the police station does not compel the conclusion that they took the defendant into custody, nor is that conclusion compelled by the fact that the police, Methuen officers, followed the defendant from Lawrence to Methuen, thereby placing themselves in position to restrain him if he did not go to the police station voluntarily. See *United States* v. *Mendenhall, supra* at 554 n.6 ("We agree with the District Court that the subjective intention of the DEA agent . . . to detain the respondent, had she attempted to leave, is irrelevant except insofar

as that may have been conveyed to the respondent"). The judge properly concluded that the evidence sought to be suppressed was not the product of an unlawful arrest.

Next, the defendant contends that his statements should have been suppressed because the warnings given to him by the police did not comply with the requirements of *Miranda* v. *Arizona*, 384 U.S. 436, 478-479 (1966), and because he did not "voluntarily, knowingly and intelligently" waive his Miranda rights. *Commonwealth* v. *Hosey*, 368 Mass. 571, 574 (1975), quoting *Miranda* v. *Arizona, supra* at 444. He also argues that his statements to the police were involuntary and that the Commonwealth's use of them at trial deprived him of his right to due process of law. *Commonwealth* v. *Mahnke*, 368 Mass. 662, 680 (1975), cert. denied, 425 U.S. 959 (1976).[2] We find none of these contentions persuasive.

The defendant grounds his argument that he received incomplete Miranda warnings on a statement made by the motion judge in his written decision. The judge stated that, when Lieutenant Duemling was asked at the hearing on the suppression motion (on cross-examination) to repeat the precise words he had used in giving the Miranda warnings, Lieutenant Duemling failed to state that he had informed the defendant that if he could not afford an attorney one would be obtained for him.[3] The judge nevertheless found that the defendant had been

[2] The defendant also contends that the motion judge's finding that the police informed him that he was a suspect prior to issuance of the Miranda warnings is clearly erroneous. We do not address this contention, however, because the *Miranda* decision does not require the police to notify a person that he is a suspect prior to obtaining a waiver of rights. *Commonwealth* v. *Amazeen*, 375 Mass. 73, 78 (1978).

[3] Actually, the judge's memory of Lieutenant Duemling's testimony was incorrect. Lieutenant Duemling testified in pertinent part: "I advised the defendant that we were investigating a homicide, stated that he was the last one we knew of that had been seen with the young female. I advised him that he didn't have to say anything if he didn't want to, that anything he did say could and would be used against him in a court of law, that he did not have to say anything unless a lawyer was present to advise him; *that if he couldn't afford a lawyer, steps would be taken to provide one for him*; that if he did agree to speak to us, that he could stop talking at any time and seek advice of counsel. I asked him if he understood what I had just said, and he stated he did."

fully informed of his Miranda rights. Even if Lieutenant Duem-
ling had failed to testify that he had informed the defendant
of his right to have a lawyer at government expense, the judge's
finding was warranted. Lieutenant Duemling testified on direct
examination that he had given the defendant the warnings re-
quired by the *Miranda* decision, and that testimony was cor-
roborated by the testimony of Captain O'Rourke of the Methuen
police. The judge was entitled to accept that testimony, and
to reason, as his memorandum of findings indicates he did,
that in light of Lieutenant Duemling's eleven years as a major
felony investigator it was highly unlikely that he failed to
inform the defendant of all his Miranda rights.

In addition to arguing that he did not receive complete
Miranda warnings, the defendant asserts that even if he did
receive complete warnings he did not waive his Miranda rights.
In order to determine whether the defendant effectively waived
his Miranda rights, it must be determined whether the defendant
knowingly, intelligently, and voluntarily waived them, and
whether the warnings and procedures required by that decision
were scrupulously observed. *Commonwealth* v. *Garcia,* 379
Mass. 422, 428 (1980). The Commonwealth bears a heavy
burden in demonstrating that the defendant made a knowing,
intelligent, and voluntary waiver of his Miranda rights. *Com-
monwealth* v. *Silva,* 388 Mass. 495, 500-501 (1983).

The defendant challenges the motion judge's finding that he
knowingly and voluntarily waived his rights under *Miranda*
on the ground that the record is silent as to any waiver of
rights. However, there was ample evidence to support the
finding. Lieutenant Duemling testified that, after informing
the defendant of his Miranda rights, he asked the defendant
whether he understood them, and the defendant, who was
shown by the evidence to have been an experienced and well-
educated businessman, responded affirmatively. That is
enough. To sustain its burden of proof on the waiver issue,
the Commonwealth is not required to show an explicit statement
by the defendant that he is waiving his rights. *Commonwealth*
v. *Westmoreland,* 388 Mass. 269, 275 (1983).

The defendant also challenges the validity of the waiver on the ground that his Miranda rights were not scrupulously honored. See *Michigan* v. *Mosley,* 423 U.S. 96, 103-104 (1975). Specifically, the defendant argues that his statement, "[i]t's beginning to sound like I need a lawyer," constituted a request to have an attorney present during questioning and that this request was not respected by the police. If a defendant requests the presence of an attorney, the interrogation must cease until an attorney is present. *Miranda* v. *Arizona, supra* at 474. The defendant's decision to cut off questioning must be scrupulously honored. *Id.* at 474, 479. *Commonwealth* v. *Brant,* 380 Mass. 876, 882, cert. denied, 449 U.S. 1004 (1980). But here, the defendant's statement was not an affirmative request to consult with an attorney. Furthermore, the judge found on adequate evidence that after the defendant stated, "[i]t's beginning to sound like I need a lawyer," Captain O'Rourke informed the defendant, "You may use the telephone to call a lawyer and you may leave at any time if you wish to do so." The defendant replied, "I don't want to leave and I don't want a lawyer." The judge's conclusion that the defendant validly waived his rights under *Miranda* was warranted by the evidence and the subsidiary findings based thereon.

The defendant contends that, even if his statement did not amount to an affirmative request for a lawyer, the conduct of the police at this point in the interrogation gave no more than lip service to his constitutional rights. He asserts that the detectives "whipsawed him . . . by having one state he was not under arrest and could leave while another officer cajoled him into not asserting that right by telling him others had spoken to them for almost two hours or words to that effect." The judge found on adequate evidence that upon entering the police station the defendant observed his friend talking to the police officer. Thus, the detective verbalized what the defendant, at least in part, already knew. In view of the defendant's education and experience, the judge properly could have concluded that it was highly unlikely that the detective's statement had any impact on the defendant's decision to speak to the police. Therefore, we conclude that the record adequately supports

the judge's conclusion that the defendant's statements to the police were made after a knowing and intelligent waiver of his constitutional rights protected by *Miranda*. Since the defendant's statements were not the product of an unlawful arrest, and were made after an effective waiver of the defendant's constitutional rights, the judge correctly refused to suppress them.

We turn now to the defendant's arguments concerning the motion judge's refusal to suppress the results of the initial benzidine test and articles of evidence seized from the defendant's home, vehicle, and person. The defendant argues first that he did not give informed consent to the performance of the benzidine test. Specifically, the defendant argues that the motion judge improperly foreclosed a line of inquiry concerning the possible carcinogenic effects of benzidine testing. This line of questioning, according to the defendant, was designed to demonstrate that the defendant's consent to the test was not informed.

As the fruits of a warrantless search, the results of the initial benzidine test properly could have been admitted in evidence only if the defendant voluntarily consented to the test. "When the Commonwealth relies on consent as the basis for a warrantless search, it must demonstrate 'consent unfettered by coercion, express or implied . . . .'" *Commonwealth* v. *Harmond,* 376 Mass. 557, 561 (1978), quoting *Commonwealth* v. *Walker,* 370 Mass. 548, 555, cert. denied, 429 U.S. 943 (1976). Voluntariness of consent to a warrantless search is a question of fact to be determined from the circumstances of each case. *Commonwealth* v. *Cantalupo,* 380 Mass. 173, 177 (1980).

The judge permissibly found that the defendant was told that the benzidine test was a chemical test designed to reveal the presence of blood, and he was told how the test would be administered. Furthermore, there was evidence to support the judge's findings that the defendant desired to at least give the appearance of cooperating with the police. Therefore, there was an abundance of evidence that the defendant willingly submitted to the initial benzidine test. He argues, however, that his consent was not legally effective if at the time he gave

his consent he was uninformed about benzidine's carcinogenic effects and that he was erroneously precluded from proving his lack of information in that regard. The defendant cites no cases, and we are aware of none, that support his argument. We are not persuaded that the effectiveness of his consent depends on whether he was informed of test characteristics that have no bearing on guilt or innocence. We conclude, therefore, that the judge did not err by refusing to exclude the evidence.

In addition to arguing that his statements and the results of the initial benzidine test should have been suppressed, the defendant contends that the motion judge should have suppressed the evidence seized from his home, vehicle, and person pursuant to the search warrants issued by the magistrate. Relying on *Franks* v. *Delaware,* 438 U.S. 154 (1978), and *Commonwealth* v. *Reynolds,* 374 Mass. 142 (1977), the defendant maintains that the supporting affidavit for the search warrants was fatally defective due to the omission of certain pieces of information of which the police had knowledge at the time the warrants were issued. The defendant asserts that the affiant police officer should have included in the supporting affidavit further details of McEvoy's description of the vehicle observed on Nevins Road. The defendant's principal contention is that the affidavit should have contained a diagram drawn by Officer Baddour on his report of McEvoy's statement to him. Although Baddour's report stated that McEvoy described the vehicle as having a "square front chrome grill," the report also contained a diagram drawn by the officer showing a rectangular two-piece grill. This diagram, according to the defendant, is inconsistent with the physical appearance of the defendant's vehicle, which had a square one-piece front grill, and this inconsistency should have been brought to the magistrate's attention because of its bearing on whether the defendant's vehicle was at the scene of the crime at a relevant hour. The defendant also maintains that the magistrate should have been informed that McEvoy had described the vehicle he saw as dark in color, and that the defendant's vehicle was gold. The defendant argues that because of the omission of this information from the search war-

rant affidavit the evidence obtained in the execution of the warrants should be suppressed.

In *Franks* v. *Delaware, supra,* the Supreme Court outlined the limited nature of judicial inquiry into the underlying facts contained in a search warrant affidavit. In *Franks,* the Supreme Court ruled that "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Id.* at 155-156. Thus, judicial examination of the veracity of the underlying facts contained in a search warrant affidavit is limited to whether the affidavit did in fact contain misstatements by the affiant and whether the misrepresentations were intentional or reckless.[4] Only if both these inquiries are answered affirmatively will the court consider an appropriate remedy. In his written memorandum, the judge did not specifically address the question whether McEvoy's description of the vehicle that he saw at 1:30 in the morning was misrepresented in the affidavit by virtue of the affidavit's omissions. That determination may be made by this court, however, since the credibility of witnesses is not involved.

Nearly all the details of McEvoy's description of the vehicle he saw were reported in the affidavit.[5] In light of the entire

---

[4] The law is clear in this Commonwealth that the suppression of evidence seized pursuant to a search warrant supported by an affidavit containing a negligent misrepresentation is not required even if the misrepresentation is necessary to a finding of probable cause. *Commonwealth* v. *Nine Hundred & Ninety-two Dollars,* 383 Mass. 764, 771 (1981).

[5] The affidavit summarized the information received from McEvoy as follows: "After investigation by Methuen Police and Massachusetts State

affidavit, had the affidavit included the omitted material it would not have conveyed a significantly different message than was conveyed by the submitted affidavit bearing on whether there was probable cause to believe that the vehicle McEvoy saw belonged to the defendant. The fact that at 1:30 A.M. the vehicle appeared to McEvoy to be "dark," although the defendant's vehicle was gold, and the fact that Officer Baddour sketched a rectangular two-piece grill (after writing that McEvoy reported seeing a "square front chrome grill"), although the defendant's vehicle had a square one-piece grill, are of so little significance in the context of the entire affidavit that their omission from the affidavit cannot reasonably be considered to be misleading or to constitute misrepresentation. Since we conclude that the cited omissions do not render the affidavit misleading, no inquiry is necessary concerning whether the omissions were intentional or reckless.

Finally, the defendant asserts that the affidavit provided the magistrate with insufficient facts to support a finding of probable cause. However, the defendant grounds this argument on the proposition that the information derived from the defendant's statements should be excised from the affidavit. Our conclusion that the judge correctly refused to suppress the defendant's statements defeats this argument. Furthermore, we reject the defendant's contention that the affidavit contained only statements of suspicion and not of fact from which the magistrate could find probable cause.[6] We conclude that the denial of the defendant's motion to suppress was not erroneous.

2. *Prosecutor's Closing Argument.*

The defendant also challenges several aspects of the prosecutor's closing argument to the jury as unfair and prejudicial.

---

Police a statement was received from Mr. Gene McEvoy of 43 Gage St., Methuen, Mass. who stated that at approximately 1:30 A.M. he observed a large, expensive, motor vehicle possibly a year or two old, said vehicle being either a Cadillac or Lincoln, with a square grill consistent with a Lincoln Continental. Mr. McEvoy observed this vehicle on Nevins Rd. in the area where the body of Priscilla "Patty" A. Cabral was discovered."

[6] The defendant argues that the warrant to search his person, authorizing "certain chemical tests," inadequately particularizes the authority given. We have concluded that the defendant gave valid consent to the initial

Although the defendant did not object to two of the challenged comments, we nonetheless consider them in accordance with our duty under G. L. c. 278, § 33E, to determine if a miscarriage of justice has occurred. *Commonwealth* v. *Storey,* 378 Mass. 312, 323 (1979), cert. denied, 446 U.S. 955 (1980). The law is clear that "[i]n closing argument, counsel may argue the evidence and the fair inferences which can be drawn from the evidence." *Commonwealth* v. *Lamrini,* 392 Mass. 427, 431 (1984), quoting *Commonwealth* v. *Hoffer,* 375 Mass. 369, 378 (1978). Furthermore, counsel may "attempt to assist the jury in their task of analyzing, evaluating, and applying evidence. Such assistance includes suggestions by counsel as to what conclusions the jury should draw from the evidence. Counsel may 'fit all the pieces of evidence together so that they form a comprehensive and comprehensible picture for the jury.'" *Commonwealth* v. *Ferreira,* 381 Mass. 306, 316 (1980), quoting *Commonwealth* v. *Haas,* 373 Mass. 545, 557 n.11 (1977).

The defendant objected at trial to portions of the prosecutor's summation which suggested that sexual activity played a part in the events that transpired in the early morning hours of May 7, 1981.[7] The defendant argues that the judge should have

---

benzidine test. The defendant does not specify what other evidence he claims should have been suppressed because of the alleged vagueness of the warrant, so we need not address this contention. In any event, the Fourth Amendment to the United States Constitution, art. 14 of the Declaration of Rights of the Massachusetts Constitution, and G. L. c. 276, § 2 (1984 ed.), require only that search warrants describe with particularity the place to be searched and the objects to be seized, not the manner in which a search is to be conducted. The manner in which evidence is seized, not argued by the defendant, is governed by the reasonableness requirement of the Fourth Amendment. See *Winston* v. *Lee,* 470 U.S. 753, 759 (1985); *Schmerber* v. *California,* 384 U.S. 757, 768 (1966)

[7] The specific comments to which the defendant objects are set forth below:

"Because is it so easy to believe that an irate husband would have attempted to have sex with his wife in the woods before he beat her [to] death? No. But perhaps somebody who had been with that person at a bar and bought her drinks, having held hands as they leave; perhaps maybe that's why the pants would be off her, perhaps that's why the pants were never found, because the pants came off perhaps

forbidden the prosecutor to refer to sex in any manner during his argument because the judge had entered a required finding of not guilty on the indictment for assault with intent to commit rape. The trial judge was correct in not precluding this portion of the prosecutor's argument.

The record clearly supports the prosecutor's statements concerning possible consensual sexual activity. The evidence and inferences that can reasonably be drawn from the evidence indicated that the defendant and the victim had socialized with each other at the Lodge, and the couple had been observed dancing, kissing, and holding hands. The defendant himself testified that the victim had gotten into his car. Furthermore, the evidence established that the victim was naked from the waist down when she was discovered. Although the evidence was insufficient to support a charge of assault with intent to commit rape, the evidence clearly suggests that some sexual activity took place on the night of the victim's death. Therefore, the prosecutor's comments were properly grounded in the evidence.

The defendant also challenges the prosecutor's rhetorical remark that "Paul Corriveau just wasn't aware that you can't wash blood off your hands. That was his mistake." The remark was based on the testimony of the State forensic chemist that the results of the initial benzidine test performed on the defendant's hands indicated there had been blood on the defendant's hands and that the defendant's hands had been washed. The remark was proper.

During his final argument, the prosecutor commented: "I suggest there's a reason he didn't go to the police, because he

---

consentually [*sic*] and still in his car when he drove away, after having beaten her."

"They were together. I suggest to you the evidence is that it may have been amorous. You have seen the nature of that area. They drove to that area. The pants were over here, the outer pants, never to be found, not by the dog 'Lucky' nor by the police.

"What happened in that car? Who said what to who [*sic*]? What anger started it? She was found — and remember 'Lucky' went directly from the spot of her death, where she was found, to a point directly back to the curb. When she rushed out, were the pantyhose ripped off her?"

did it. And he didn't call an ambulance because if he hadn't already known that he killed her, he certainly left with the idea that she was going to die shortly." The defendant argues that the prosecutor impermissibly asked the jury to speculate as to why the defendant did not call the police or an ambulance in an attempt to secure aid for the victim. He contends further that the prosecutor improperly appealed to the passions, emotions, and sympathies of the jury. The argument was proper. The defendant had testified that he had left the Lodge with the victim during the early morning hours of May 7, 1981, and that while he and the victim were at his vehicle the victim's estranged husband appeared. He testified that, after a brief confrontation, the victim's husband got into the defendant's vehicle and the three drove off, and that, at the request of the victim's husband, the defendant stopped his vehicle on Nevins Road and let the couple out. After initially driving away, according to his testimony, the defendant returned to Nevins Road and discovered the victim badly beaten. He did not call an ambulance or the police, however, because he did not want to get involved. Not only was the remark a proper comment on the defendant's credibility, but it was proper argument on the issue of intent as well.

During the prosecutor's summation, the defendant objected to the argument which appears in the margin below.[8] As soon as the judge sustained the defendant's objection, the prosecutor terminated that line of argument. The defendant now argues that the judge immediately should have given a curative instruction. But no curative instruction was requested. Furthermore, to the extent the defendant's objection was that there was no evidence to support the argument, any possible prejudice was minimized by the judge's instruction in the course of his charge that closing arguments were not evidence. *Commonwealth* v. *Ferreira, supra* at 317.

---

[8] THE PROSECUTOR: "Who put the shoes in the ceiling? Was it Mrs. Corriveau? Was it Mr. Corriveau? If you had come home and told your wife this story of what had happened and about a woman lying in the woods, would you have then made the call that evening to the police anonymously? If you had come home and told your husband or wife this story—"
DEFENSE COUNSEL: "Objection."
THE JUDGE: "I think you had better drop that line of argument."

The final two statements challenged by the defendant were not objected to at trial. The first remark cited by the defendant was the prosecutor's statement, "Think of how long she was alive, bleeding, drowning. Think of all those factors when you consider at some point, be it initially or during the course of the event — he intended her to die, he intended to kill her. Think of that when you think of what he did — of the suffering, of the pain, of the acts that he caused." This comment was proper. At trial the forensic pathologist who performed the autopsy testified that the aspiration of blood was a contributing factor in the victim's death. Furthermore, the prosecutor was warranted in calling the jury's attention to the pain suffered by the victim because the Commonwealth's view of the case was that the defendant murdered the victim with extreme cruelty or atrocity.

The other comment criticized by the defendant was improper. The prosecutor stated, "[J]ust imagine what the floor mat must have looked like when he picked it up that morning at his house and threw it away someplace. And then when he took the pocketbook that was locked in his car by Priscilla Cabral, as he must have run out of that car for whatever reason, and then he took that pocketbook and threw it away." The prosecutor was asking the jury to speculate on occurrences not in evidence. However, viewing these remarks in light of the prosecutor's entire argument, and in light of the judge's instructions to the jury, we conclude that any prejudice accruing to the defendant as a result of these comments was minimal and therefore no substantial risk of a miscarriage of justice resulted.

3. *Jury Instructions.*

The defendant's challenges to the judge's charge are without merit. First, he argues that the judge misstated the law when he stated that "the law makes no distinction between direct testimony and circumstantial." While the law does distinguish between direct and circumstantial evidence, it is well established that there is no difference in the probative value of each type of evidence. *Abraham* v. *Woburn,* 383 Mass. 724, 729 (1981). Read in the context of the entire charge, the statement clearly referred to the probative value of the evidence. Therefore, there was no misstatement of the law.

The judge also stated, "It is not essential that an inference drawn from facts or circumstances be necessary. It is enough if the inference is reasonable. It is not necessary to prove that no one other than the accused could have done the act, that another might have had the opportunity to do the act. That goes only to the weight of the evidence, and the weight of the evidence is for the jury." The defendant contends that this portion of the charge was a serious misstatement of the law. On the contrary, the instruction was correct.

The defendant also asserts that the trial judge erred by failing to instruct the jury concerning alibi. We disagree. At trial the defendant did not request an alibi instruction. At trial the defendant testified that, after leaving the victim and her estranged husband at Nevins Road, he began to drive home but after a few minutes decided to make sure the victim was safe. While driving toward Nevins Road on Route 28 he observed the victim's husband running away. After he got back to Nevins Road, the defendant testified he discovered the victim's body in the woods. According to the defendant, because he took the witness stand and testified that he was not at the scene of the crime at the time of the murder, he was entitled to an alibi instruction without having requested it. However, the defendant points to no authority and we are aware of none in support of his position. There was no error.

The defendant also alleges that the judge erred by refusing to instruct on manslaughter. According to the defendant, the Commonwealth had taken the position in final argument that, if the defendant's version of the facts were believed, the defendant was responsible for increased harm to the victim when he failed to call an ambulance after he returned to the scene of the crime. The defendant also points to medical testimony that the victim may have survived several minutes or even an hour or two after the beating. Therefore, the defendant contends, he was entitled to instructions on both voluntary and involuntary manslaughter.

The prosecutor's argument did not suggest that the defendant was guilty of manslaughter, but only suggested that the defendant intended the victim to die. In any event, we restate the

rule that, in a homicide case, the trial judge should charge the jury on the issue of manslaughter where any view of the evidence, not of the prosecutor's argument, permits a finding that the offense is manslaughter and not murder. *Commonwealth v. Vanderpool,* 367 Mass. 743, 745-746 (1975). A judge should not charge the jury on a hypothesis not supported by the evidence, however. *Id.* at 746. Here, there was no evidence of passion, sudden combat, or provocation that would permit an instruction on voluntary manslaughter, nor was there evidence that the defendant unintentionally but recklessly killed the victim, justifying an instruction on involuntary manslaughter. The trial judge correctly refused to instruct on manslaughter.

4. *Relief Under G. L. c. 278, § 33E.*

We have reviewed the entire record as required by G. L. c. 278, § 33E, and we have considered the defendant's pro se argument that he was denied a fair trial by the judge's failure to remove one of the jurors and his failure to question the juror after the juror informed the judge that he had been in the same union as the victim's husband. Before receiving that information, the judge had conducted a voir dire examination of the juror focusing on another matter and had found the juror indifferent. Neither defense counsel nor the defendant himself requested a further colloquy between the judge and the juror after they were made aware of the new information. We find no reason to disturb the judge's finding that the juror was indifferent, and we find no other ground entitling the defendant to relief under § 33E.

*Judgment affirmed.*