COMMONWEALTH vs. CURTIS STEVENSON
(and three companion cases[1]).

No. 97-P-2073.

Hampden. January 7, 1999. - March 19, 1999.

Present: KASS, KAPLAN, & LENK, JJ.

*Identification. Evidence,* Identification, Admissions and confessions, Alibi. *Alibi. Practice, Criminal,* Instructions to jury.

At the trial of indictments, there was insufficient evidence of the defendants' opportunity to hear, understand, and respond to statements the victim made to a police officer, identifying the defendants as the ones who had committed the crime, to warrant the judge's instructing the jury on silence as an adoptive admission, and the error was not harmless where identification was the main issue at trial. [511-512]

INDICTMENTS found and returned in the Superior Court Department on February 7, 1995.

The cases were tried before *William H. Welch,* J.

*Michael S. Hussey,* Committee for Public Counsel Services, for Curtis Stevenson.

*Glen P. Randall* for Deborah Waters.

*Marcia B. Julian,* Assistant District Attorney, for the Commonwealth, submitted a brief.

LENK, J. The defendants, Curtis Stevenson and Deborah Waters, were convicted on indictments charging them with (1) armed assault with the intent to rob (G. L. c. 265, § 18[*b*]), and (2) assault and battery with a dangerous weapon, to wit: a knife (G. L. c. 265, § 15A[*b*]), in connection with the January 13, 1995, mugging of James Dionne on Chestnut Street in Springfield.[2] Both defendants filed timely appeals claiming the judge erred in making an evidentiary ruling at trial. In addition,

---

[1]Two against Deborah Waters and one against Curtis Stevenson.

[2]Waters was also charged as a habitual offender (G. L. c. 279, § 25), and she pleaded guilty to that charge after the jury trial was concluded.

Waters claims that the judge erred in denying her request for an instruction on alibi.[3]

The following evidence was presented at trial. Some time after 10:30 P.M. on January 13, 1995, while Dionne was walking toward the intersection of Chestnut and Pearl Streets, he came upon a man and a woman sitting in the doorway of 121 Chestnut Street. As Dionne walked by, the woman asked him for a cigarette, and he complied with her request. The woman then asked Dionne if he was "going out," and if he had any money. Dionne replied "no" to both questions. The woman then jumped on Dionne's back and began to slash at him with a utility knife, cutting his jacket, pants, and left wrist, while demanding that he give her his wallet. At the same time, the man pulled on Dionne's leg, telling the woman to "cut him, cut him," and preventing Dionne from escaping.

Henry Lyons was sitting inside of his vehicle at the traffic light at the intersection of Chestnut and Pearl Streets when he heard Dionne's cries for help and saw figures engaged in a struggle in the doorway of 121 Chestnut Street. By the time Lyons turned the corner at the light, left his vehicle, and walked back to Chestnut Street, the struggle had moved into the middle of Chestnut Street. There, Lyons saw Dionne lying in the road, yelling for help, while a woman kicked him and a man walked away. Lyons pushed the woman away from Dionne and the woman, who was now an arm's length away from Lyons, turned toward Lyons, brandishing a utility knife. Lyons then saw the man begin to approach him with a bottle in his hand. At that point, Lyons testified, police cruisers began to arrive and the man and woman walked away toward Hillman Street.

At the scene, Lyons and Dionne identified the defendants as the assailants and they identified a utility knife, which police found in a gutter on Hillman Street, as the weapon used in the attack. Dionne testified that he saw both individuals' faces while he conversed with the woman in the doorway and Lyons testified that the street was well lit and that he saw both assailants' faces. At trial, Dionne and Lyons identified the defendants as the assailants and the utility knife as the weapon that was used in the attack.

---

[3]Although Stevenson also raised this issue at trial, he has not raised it on appeal; therefore, he has waived his claims regarding this issue. Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975). See *Commonwealth* v. *Haywood*, 377 Mass. 755, 756 n.1 (1979) ("Assignments of error not briefed are deemed waived").

The defendants proceeded on the theory of mistaken identification and alibi. Although neither defendant testified, they presented evidence that another couple, whose physical appearances closely resembled those of the defendants, had been in the area moments before the attack and that the defendants had been speaking with a security guard at a nearby apartment complex around the time of the incident. Although the judge agreed to instruct the jury on interracial identification,[4] he denied the defendants' requests to charge the jury on alibi.

1. *Evidentiary ruling.* The contested evidentiary ruling occurred during Springfield police Officer Ambrose's testimony and concerned statements made by Dionne when he identified the defendants at the scene of the incident. Ambrose testified that in response to a report of a disturbance at the corner of Chestnut and Pearl Streets, he and his partner drove to the intersection of Hillman and Chestnut Streets[5] in their marked police cruiser. When Ambrose got out of the cruiser, Dionne approached him. Ambrose testified that the defendants stood within five to eight feet behind Dionne while Dionne told him what had happened. Ambrose testified, over the defendants' objections,[6] that Dionne told him that "Waters pulled out a utility knife and began attempting to slash him" and that "the codefendant was holding him from behind so he couldn't get away." Ambrose testified that Dionne indicated that he was speaking about the two defendants when he made the statements to Ambrose and that the defendants were placed under arrest after Dionne told Ambrose about the incident. Dionne's statements about the defendants' actions were repeated the next day when the Commonwealth resumed its direct examination of Ambrose. Once again, counsel for both defendants objected when the prosecutor asked Ambrose what Dionne told him. On the second day, however, the judge ruled "he may answer if the

---

[4]Dionne and Lyons are white, whereas the defendants are both black.

[5]The record indicates that the intersections of Chestnut and Hillman Streets and Chestnut and Pearl Streets are in an area known as the Apremont Triangle, which was described as the area where Dionne was attacked.

[6]Although Waters's counsel did not state the grounds for his objection, Stevenson's counsel objected to the testimony on hearsay grounds. No ruling was made on the record regarding that objection.

defendants were present." Both defense counsel objected to this ruling.[7]

At the conclusion of Ambrose's testimony, the judge instructed the jury that if they found the existence of certain predicate facts, they could consider the defendants' silence in response to Dionne's accusations as adoptive admissions. Both defendants objected to the instruction stating that it was given "out of context" and that at the time that the statement was made, the defendants had a right to remain silent; therefore, their failure to comment in response to Dionne's statements could not be used against them. During the final charge, the judge further instructed the jury on adoptive admissions by silence, and both defense counsel renewed their objections.

On appeal, Stevenson argues, as he did at trial, that the judge's instructions violated the defendants' right against self-incrimination and materially tainted the jury's appraisal of the identification testimony. Waters claims that the statements themselves were inadmissible hearsay and argues that the judge erred by (1) failing to conduct a voir dire prior to ruling on the admissibility of this evidence; (2) taking away counsel's strategic decision whether to request the instruction or not; and (3) giving an instruction which left to the jury a ruling of law. Both Stevenson and Waters also argue on appeal that the instruction was erroneous because there was no evidence that either defendant heard or understood Dionne's statements, especially where the statements were made to a third party and there was no evidence that the defendants in fact remained silent.

We think it clear, as Stevenson concedes, that Ambrose could properly testify about Dionne's statements as corroborative identification testimony. *Commonwealth* v. *Schand*, 420 Mass. 783, 795 (1995). Equally plain is that the judge did not admit the challenged testimony for this limited purpose, but rather

---

[7]Stevenson's counsel argued that whether the defendants were present when the statement was made was a question for the jury, whereas Waters's counsel argued that in addition to being hearsay, the testimony was unduly prejudicial because the questions had been asked and answered the previous day and the Commonwealth had also obtained this evidence through Dionne and Lyons. At that point, the judge informed counsel that he would charge the jury on adoptive admissions. Stevenson's counsel renewed his objection when the testimony resumed. During cross-examination, Ambrose testified that when he arrived at the scene, Dionne came across Chestnut Street to the corner of Chestnut and Hillman Streets and that the defendants followed Dionne, stayed in the area, and did not attempt to leave.

admitted it substantively for its truth. Accordingly, the judge twice told the jury that, if they found the foundational elements, they could consider the defendants' silence as an admission to the accusations made against them by Dionne. This was error.

Under the adoptive admission exception to the hearsay rule, "when an accused remains silent after hearing a statement tending to incriminate him, both the statement and the defendant's failure to deny it may be admissible (but with the exercise of caution) if he heard, understood, and had sufficient knowledge to reply to the statement, and if it would have been natural for a person, in the circumstances, to respond. No admission by silence may be inferred, however, if the statement is made after the accused has been placed under arrest, after the police have read him his Miranda rights, or after he has been so significantly deprived of his freedom that he is, in effect, in police custody." *Commonwealth* v. *Ferrara*, 31 Mass. App. Ct. 648, 652 (1991) (citations omitted).

We observe that the judge made no explicit findings as to whether the defendants were in custody at the time Dionne made the statements to Ambrose but, to the extent that he overruled the defendants' objections to the testimony and to his instructions, we take it that he implicitly found that they were not in custody. *Ferrara*, 31 Mass. App. Ct. at 654. The record conceivably supports this. All agree that the defendants had not been arrested at the time of their on-the-scene identification by Dionne, but were arrested immediately thereafter. Contradictory evidence was elicited as to the circumstances under which Dionne made the accusatory remarks to Ambrose. While Ambrose testified that Dionne approached and spoke with him, with the defendants remaining five to eight feet away, Dionne testified that the defendants had initially tried to run after the mugging but were apprehended by the police and brought to the cruiser where, from a distance of about three feet, Dionne was asked to identify them. Lyons, who happened upon the mugging and came to Dionne's rescue, testified that he had directed the police to where the defendants were casually walking down the street. On Lyons's and Dionne's accounts, the circumstances suggest a custodial environment where the defendants were "present" at the police cruiser only "by reason of at least some police pressure and it is hardly likely that [they] would have been permitted to leave." *Commonwealth* v. *Freeman*, 352 Mass. 556, 563 (1967). However, the Commonwealth suggests that, on Am-

brose's account, he had but begun his preliminary investigation when he heard Dionne's statements and any focus upon the defendants had itself just begun — reasonable persons would hence not have considered themselves to be in custody. We pass on the point because, even if the defendants were not in custody, no adverse use of their failure to speak should have been instructed.

Evidence of adoptive admissions "is to be received with caution, especially in criminal cases, due to the fact that the meaning of a defendant's response, or lack thereof, to an accusatory statement is often ambiguous." *Commonwealth* v. *MacKenzie*, 413 Mass. 498, 506 (1992). "As foundation for the evidence, it must be apparent that the party has heard and understood the statement, that he had an opportunity to respond, and that the context was one in which he would have been expected to respond to an accusation." *Commonwealth* v. *Olszewski*, 416 Mass. 707, 719 (1993), cert. denied, 513 U.S. 835 (1994). See Liacos, Massachusetts Evidence § 8.85 (6th ed. 1994). The evidence here was far from sufficient to permit the jury to consider whether or to conclude that such a foundation existed.

All the jury had before them as to the defendants' opportunity to hear, understand, and respond to statements made by Dionne — statements notably made not to them but to a police officer — was that the defendants were present, anywhere from three to eight feet away from the conversants. Dionne did not shout or yell but spoke calmly and face to face for about five minutes with Ambrose outdoors, at night, near at least one police cruiser with an operative radio then receiving police dispatches. The defendants' mere presence in the vicinity of a conversation in which they were not participants does not make it at all apparent that they could hear, let alone understand and respond to, Dionne's statements about them. Indeed, there does not appear to have been any evidence that the defendants were in fact silent in response to such accusations. Under these circumstances, the evidence did not permit the jury to conclude that the defendants had impliedly admitted those accusations.

Even if error, however, the Commonwealth maintains that it was harmless. We think not. Identification was an issue that was both central to the defense and hotly contested at trial. In addition to challenges to the two eyewitnesses' ability to perceive, there was defense evidence that, moments before the attack, another couple closely resembling the defendants had been seen

in the area by a security guard. While the weapon used in the mugging was found nearby, no fingerprints tying it to the defendants rather than to the other couple were taken. Because the jury may have considered the defendants' silence as implied admissions of guilt, underscoring their identity as the assailants, we cannot conclude that the error was harmless under the circumstances. See *Commonwealth* v. *Corridori,* 11 Mass. App. Ct. 469, 481 (1981).

2. *Alibi evidence.* Waters claims that the judge committed reversible error by denying her request to instruct the jury on alibi, but fails to cite any legal authority in support of her claim; consequently, her argument fails to rise to the level of proper appellate argument, and we need not address it. Mass. R.A.P. 16(a)(4). *Commonwealth* v. *Bowler,* 407 Mass. 304, 310 (1990). In any event, there was no error. No alibi instruction was warranted because the evidence did not show that the security guard, Orlowski, was with the defendants at the time of Dionne's attack. Compare *Commonwealth* v. *Corriveau,* 396 Mass. 319, 340 (1985). "A judge should not charge the jury on a hypothesis not supported by evidence . . . ." *Id.* at 341. Moreover, the judge adequately addressed the issue when he instructed the jury that the Commonwealth had the burden of proving beyond a reasonable doubt that "the defendants were in fact present at the time and place of the offense and that they in fact committed the offense." See *Commonwealth* v. *Keaton,* 36 Mass. App. Ct. 81, 88 (1994). See also *Commonwealth* v. *Medina,* 380 Mass. 565, 579 (1980).

Because we have concluded that the defendants were prejudiced by the judge's instruction that the jury could consider their silence as adoptive admissions, the judgments are reversed, and the verdicts are set aside.

*So ordered.*