COMMONWEALTH vs. GARY A. RICHENBURG.

Worcester. October 5, 1987. — January 28, 1988.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, NOLAN, & O'CONNOR, JJ.

*Homicide. Practice, Criminal*, Disclosure of evidence, Discovery, Cross-
examination by prosecutor, Newspaper article, Argument by prosecutor,
Request by jury. *Due Process of Law*, Disclosure of evidence. *Evidence*,
Nonexistence of evidence, Scientific test, Photograph, Relevancy and
materiality.

The record of a criminal trial did not support the defendant's contentions
that the prosecution, in violation of a pretrial agreement, failed to preserve
autopsy samples, disclose test results, and provide items for inspection
and testing. [667-669]

Failure of the Commonwealth to perform blood identification tests on semen
detected during an autopsy on the body of a murder victim did not
constitute a suppression of evidence in violation of the due process rights
of one accused of the crime. [669]

A defendant charged with murder and rape was not prejudiced by any delay
in the prosecution's disclosure of a composite sketch which had been
prepared from a witness's description of a man she had observed near
the dumpster in which the victim's body was found, where the sketch
was furnished to the defendant's counsel five days before commencement
of trial and where both the sketch and the witness's in-court identification
were excluded from evidence when offered by the prosecution. [669-670]

A defendant charged with murder and rape was not prejudiced by any delay
in the prosecution's disclosure of the existence of a certain news photo-
graph and the fact that a witness told a State police officer that she had
identified the defendant from the photograph, where both the photograph
and the witness's identification testimony were excluded from evidence
at trial. [671]

The record of a criminal trial did not support the defendant's claim of
prejudice resulting from the prosecution's alleged failure to make timely
disclosure of a police report, where it did not appear that defense counsel,
on receiving the report, had sought a continuance or otherwise attempted
to remedy any possible prejudice. [671]

In the circumstances of a criminal trial, a variation, in one particular,
between the testimony of the prosecution's chemist and that witness's
report as furnished to the defendant pursuant to a pretrial agreement did
not constitute a violation of the agreement. [671-672]

At a murder trial a judge acted within his discretion in determining that the probative value of certain autopsy photographs outweighed any prejudicial effect. [672-673]

At a criminal trial no substantial risk of a miscarriage of justice was created by a line of questioning, during the prosecutor's cross-examination of the defendant, in which the defendant was asked whether he agreed with the testimony of other witnesses. [673-674]

The judge at a criminal trial was entitled to rely on the jury's negative response to his collectively questioning whether any of them had read or heard of an allegedly prejudicial newspaper article, and he acted within his discretion in denying the defendant's motion for a mistrial based on the publication of the article. [674]

Although the prosecutor's closing argument at a murder trial, in referring to the victim's having been tied to a support column in the cellar of a building, may have exceeded the scope of the evidence, any overreaching did not rise to a level requiring reversal of the defendant's conviction. [674-675]

The judge at a criminal trial was aware that he had discretion to grant or deny the jury's request to review portions of a witness's testimony during their deliberations, and he acted within his discretion in denying the request. [675-676]

INDICTMENTS found and returned in the Superior Court Department on September 14, 1982.

The cases were tried before *Robert V. Mulkern*, J.

*John F. Buckley* for the defendant.

*Katherine E. McMahon*, Assistant District Attorney, for the Commonwealth.

NOLAN, J. On August 4, 1982, a young woman was raped and murdered. The victim's partially nude body was discovered wrapped in a red blanket and two trash bags tied with four pieces of rope. The body was found with two other trash bags containing various bloodstained debris including rope, insulation board, and cleaning rags in a dumpster located at an apartment complex in Westborough. The victim had been raped, stabbed vaginally, and strangled. The victim's jugular vein had been punctured causing severe blood loss before her death. The evidence showed that the victim was murdered in the basement of the Emporium, a game arcade in Worcester. The victim worked at the Emporium for a three-week period

prior to her death. After trial, the defendant, also an employee at the Emporium, was convicted of murder in the first degree on the grounds of both extreme atrocity or cruelty and of felony-murder. The defendant was also convicted of aggravated rape.[1] The defendant appeals.

The defendant argues that: (1) the Commonwealth failed to preserve autopsy samples, disclose test results, and provide items for inspection in violation of a pretrial agreement and, hence, their subsequent admission in evidence was error; (2) the Commonwealth's failure to perform identification tests on semen samples constituted a suppression of evidence in violation of the defendant's due process rights; (3) several delayed disclosures of evidence prejudiced the defendant; (4) he was prejudiced by the introduction of inflammatory autopsy photographs; (5) the prosecutor improperly asked him to comment on the credibility of witnesses; (6) the trial judge abused his discretion in failing to declare a mistrial based on prejudicial publicity; (7) the prosecutor made improper comments in his closing arguments that prejudiced the defendant; and (8) the trial judge improperly denied the jury's request to review a witness's testimony by examining portions of the transcript. We find no error warranting reversal nor reason to exercise our powers of relief under G. L. c. 278, § 33E (1986 ed.). Accordingly, we affirm the convictions.

At trial, Isabella Tarducci testified against the defendant. Mrs. Tarducci lived in an apartment overlooking the dumpster where the victim's body was found. On the evening of the murder, the witness heard a loud noise, got out of bed, and looked out the window. For approximately three minutes, Mrs. Tarducci observed a tall man in the parking lot. She saw the man lift two dark plastic bags out of a "shiny brown" truck and drop them in the dumpster. She then watched the man remove a long bag from the truck and throw it in the dumpster.[2]

---

[1] On the murder conviction, the defendant was sentenced to commitment for life at the Massachusetts Correctional Institution, Cedar Junction. The defendant also received a second, consecutive life sentence for the aggravated rape conviction.

[2] During the trial, Mrs. Tarducci identified a photograph of the defendant's truck as the truck she observed next to the dumpster on the night in question.

A short time later, the witness' husband returned from work. After checking the dumpster, Mr. Tarducci called the police. Mrs. Tarducci then helped the Westborough police create a composite sketch of the man she viewed in the parking lot. A few days later, Mrs. Tarducci noticed a newspaper article concerning the murder and a photograph of the defendant in the Middlesex News. The article recounted Mrs. Tarducci's observations on the night of the murder.

At trial, several coworkers of the defendant described the defendant's demeanor and activities at the Emporium on the evening of August 4, 1982. One coworker testified that the defendant was sweating so excessively that it appeared that he was crying. Ms. Roy testified that, during the evening, she descended the Emporium's cellar steps in search of the defendant. Ms. Roy stated that the defendant ran up the stairs to meet her. According to Ms. Roy, the defendant failed to answer the telephone several times during the evening, although he would ordinarily do so.

State policemen testified concerning what they observed and collected in the basement of the Emporium. This included rags, garbage bags, clothesline rope, cardboard, plasterboard, dirt and dust. There was also a condom wrapper on the floor. The basement was littered and dirty except for one swept section. Chemical tests revealed the presence of blood in the cellar bathroom sink and on pieces of cardboard. Debris contained in the trash bags discovered in the dumpster was similar to the materials collected in the cellar.

After warrants were secured, troopers searched the defendant's truck and home. Search of the truck revealed plaster debris in the back of the truck and a stained, single edged hunting knife under the front seat. The knife tested positive for the presence of blood. The police also collected some of the defendant's clothing, including a pair of unlaundered socks which revealed bloodstains.

Officers who interviewed the defendant shortly after the murder testified that, upon questioning, the defendant stated that the victim had been at the Emporium on the night she was murdered. The defendant stated that he allowed the victim to

use the bathroom in the basement. The defendant then told the officer that the victim returned, asked for some arcade tokens, and made a couple of telephone calls. According to the defendant, the victim must have left shortly after 7 P.M.

The pathologist who conducted the autopsy testified that after removing the victim's body from the plastic bags he observed that she was wearing only a bra and blouse which had been pulled up on her body. The body was covered with small plaster chips. An eight foot long rope was knotted so tightly around the victim's throat that it had caused blisters. There was also a wound on her throat caused by a sharp instrument which severed the jugular vein. The pathologist also observed a great deal of blood on the victim's genitals and upper thighs. The body bore numerous facial injuries as well as a rope mark on the arm. The pathologist indicated that he found several physical indications of suffocation by ligature. He also testified that there was significant blood loss from the severed vein and two internal genital wounds located two and four inches inside the vagina. During the autopsy the doctor took several smears of the vaginal and rectal cavities. He used these to make slides which indicated the presence of semen. The pathologist concluded that the vaginal wounds were made after the throat was cut, but while the victim was still alive. He acknowledged that blood typing tests could be performed on semen samples. However, the pathologist accounted for his failure to perform such tests by explaining that his laboratory lacked the necessary facilities.

A State chemist also collected evidence and performed chemical tests. The chemist found the presence of human blood on the defendant's truck's steering wheel and truck bed. The chemist also examined vaginal slides and noted the presence of sperm. However, there was no indication of the presence of sperm on the anal slides. Both the chemist and the pathologist recorded their findings and test results in their reports.

1. *Failure to disclose various test results.* The defendant insists that the pretrial discovery agreement entered into by the parties was violated by the pathologist's failure to preserve the autopsy samples for a reasonable period of time and by

the Commonwealth's failure to inform the defendant of the results of the scientific tests. The defendant asserts that he was unaware of the existence of smears taken from the victim's oral, vaginal, and rectal cavities during the autopsy. He also argues that the results of testing done on these samples were unavailable to him before trial. Finally, the defendant argues that the pathologist's failure to preserve the autopsy samples denied the defendant the opportunity to perform his own tests in preparation of trial.

The Commonwealth vigorously disputes the allegation that test results were not provided to the defendant. Regarding the failure to preserve slides, the Commonwealth acknowledged that the defendant had a right under the pretrial agreement to view the slides. However, the Commonwealth contends that the defendant never requested an opportunity to examine the slides. It is not established before us that the defendant requested an opportunity to inspect the slides and that he was not provided with test results.[3]

The record indicates that the defendant was informed that slides were made of various smears, that some slides tested positive for sperm, and that the autopsy report and the report of the State chemist differed in the results of the anal smear analysis. We therefore conclude that the defendant was made aware of this information and the fact that it might ultimately be part of the Commonwealth's case against the defendant. The defendant was also alerted to a discrepancy that could have provided a basis for challenging the test results. There is no indication that the defendant ever requested that further testing be performed by his own experts or by those of the Commonwealth.

Nor does the record support the defendant's contentions that the smear slides were prematurely discarded. A timely request by the defendant would have provided him with the opportunity to perform his own analyses. It is only on appeal that the defendant alleges he would have performed such testing. The

---

[3] The defendant could have made this contention in his motion for new trial so that there would have been an evidentiary hearing on this issue.

defendant's mere conjecture as to the avenues he would have pursued does not convince us that he was truly deprived of an opportunity.

2. *Failure to perform blood-typing analysis.* The defendant asserts that the Commonwealth's failure to perform blood identification tests on the semen detected during the autopsy procedure constituted a suppression of evidence in violation of his due process rights. The Commonwealth maintains that it had no affirmative duty to pursue potentially exculpatory evidence for the benefit of the defendant. We conclude that there was no suppression of evidence in this matter.

We have held that the Commonwealth's failure "to conduct certain tests or produce certain evidence was a permissible ground on which to build a defense" and that the defendant may argue such a defense. *Commonwealth* v. *Bowden*, 379 Mass. 472, 485-486 (1980). See *Commonwealth* v. *Rodriguez*, 378 Mass. 296, 308 (1979); *Commonwealth* v. *Pettie*, 363 Mass. 836, 840-841 (1973). However, the failure to conduct blood typing tests does not constitute suppression of evidence in violation of due process within the doctrine of *Brady* v. *Maryland*, 373 U.S. 83 (1963). *Commonwealth* v. *Lewinski*, 367 Mass. 889, 899 (1975). See *Commonwealth* v. *Neal*, 392 Mass. 1, 8-9 (1984).

3. *Defendant's assertions of delayed discovery.* The defendant contends that he was notified on February 9, 1983, that a composite sketch had been prepared from Mrs. Tarducci's description of the man she observed at the dumpster. The defendant complains that this notice came two days after the conference in which both parties agreed that discovery had been completed. The defendant argues that this delayed disclosure was in violation of the pretrial conference agreement. He also contends that the composite sketch was exculpatory. Accordingly, the defendant insists that he could have prepared more effectively for trial if he had been informed of the existence of the sketch in a timely fashion.

The Commonwealth responds by explaining that it furnished the composite sketch as part of its continuing duty to disclose evidence. See Mass. R. Crim. P. 14 (a) (4), 378 Mass. 874

(1979). The Commonwealth notes that, although the defendant had the composite sketch approximately one week before trial, he failed to file a pretrial motion to suppress the identification testimony. Finally, the Commonwealth argues that the defendant was not injured by any alleged delay in disclosure because the trial judge ultimately precluded the prosecutor from introducing the sketch in evidence.

When there are allegations that a prosecutor has failed to disclose exculpatory evidence, we consider the exculpatory and material nature of the evidence in question. We also consider whether the defendant was prejudiced by any delays in disclosure. *Commonwealth* v. *Lam Hue To*, 391 Mass. 301, 308 (1984). The composite sketch could be considered exculpatory because the judge found that there were major discrepancies between the composite sketch and the actual appearance of the defendant. Furthermore, the sketch may arguably have been material to the defendant's case if it created a reasonable doubt that did not otherwise exist. *Commonwealth* v. *Wilson*, 381 Mass. 90, 107 (1980). However, we are not convinced that the defendant was prejudiced.

The defendant is not persuasive when he argues that he was prejudiced by the delayed disclosure of the sketch. Unlike the defendant in *Commonwealth* v. *Lam Hue To, supra* at 309, who received exculpatory information only after his trial strategy was set and his opening argument was completed, the defendant in this case received the composite sketch five days before the commencement of trial. The defendant could have moved for suppression of the sketch. More significantly, the defendant was not prejudiced because the judge ultimately excluded the sketch and an in-court identification of the defendant by Mrs. Tarducci, the witness whose observations were transformed into the composite. The defendant was not entitled to a mistrial on this ground.

In fact, the defendant's argument suffers from a patent inconsistency. He argues that the composite sketch was exculpatory, yet he never attempted to offer it in evidence. Nor does he now argue that it should have been admitted. Conversely, if the sketch was inculpatory, the defendant cannot legitimately complain because the judge excluded it.

The defendant also complains that the Commonwealth was late in disclosing the existence of a newspaper photograph and the fact that Mrs. Tarducci told a State trooper that she identified the defendant from that photograph. At trial the judge excluded the photograph and Mrs. Tarducci's identification testimony. Thus, there was obviously no prejudice to the defendant even if that information was not timely disclosed to him. See *Commonwealth* v. *Bryant*, 390 Mass. 729, 748 (1984).

The defendant next claims that he was provided with a Worcester police report for the first time at trial. Once again, the parties disputed whether the prosecutor had furnished this report to the defendant in compliance with the pretrial discovery agreement. The judge made no specific finding as to whether the defendant received the report. The judge did, however, comment that allegations regarding intentional nondisclosure could not be raised on a mere "bald assertion" by the defense attorney where evidence to the contrary was presented by the Commonwealth.

On appeal the defendant argues that this late disclosure prevented him from effectively cross-examining the Worcester police officer. Counsel did not, however, request a continuance during the trial. This tends to undermine the defendant's assertion that he would have pursued a different course of cross-examination if he had received the report earlier. *Commonwealth* v. *Bryant, supra* at 749. In *Commonwealth* v. *St. Germain*, 381 Mass. 256, 263 (1980), the defendant asserted that he was prejudiced by delayed disclosure of exculpatory evidence, but failed to take opportunities at the time of trial to remedy any possible prejudice. There we found no legitimate basis for the defendant's complaint. *Id.* at 265. Here, the judge appeared to view the defendant's claim of nondisclosure as just that, an allegation without support. In light of this and the fact that the defendant himself failed to view his potential disadvantage as being serious enough to warrant a request for a continuance, he is entitled to no relief from this court.

The defendant's last allegation of error with regard to delayed disclosures is that the chemist's failure to include his observation of a leaf in the Emporium's basement as part of his report

(though he testified about the leaf) worked to the disadvantage of the defendant during trial. It is not a violation of a pretrial discovery agreement if a witness's testimony differs somewhat from his written report which was provided to the defense. *Commonwealth* v. *Rose*, 13 Mass. App. Ct. 951, 953 (1982). This is particularly true where there is no evidence that the prosecutor knew before the witness took the stand that the witness's testimony would vary from his written report. *Id.* We find this reasoning persuasive. The defendant in this case had the opportunity to cross-examine the witness concerning the discrepancy if he felt the need to impeach the witness.

4. *Autopsy photographs.* The defendant complains that inflammatory and prejudicial autopsy photographs were introduced at trial. Specifically, the defendant objects to the admission of a photograph of the victim's head with a rope around the neck, and a photograph of the victim's genitalia depicting two internal wounds of the vagina. The defendant insists that the photographs had no evidential value. We have examined the photographs and conclude that the judge was within his discretion in determining that the probative value of the photographs outweighed any prejudicial effect.

We begin with the proposition that "[t]he admissibility of photographic evidence is a matter left to the sound discretion of the judge, and the defendant bears a heavy burden of demonstrating abuse of that discretion." *Commonwealth* v. *Glowacki*, 398 Mass. 507, 512 (1986). Although there was no dispute as to the cause of death in this case, the judge had the discretion to admit relevant evidence. *Commonwealth* v. *Todd*, 394 Mass. 791, 796 (1985). Here, although the medical examiner testified to the nature, number, and location of the victim's wounds, this testimony could be supplemented with autopsy photographs. *Id.* Since the Commonwealth was prosecuting the defendant for murder in the first degree on grounds of extreme atrocity or cruelty and felony-murder, as well as for aggravated rape, the photographs depicting ligature and stab wounds to the neck and vagina were highly relevant. *Commonwealth* v. *Sielicki*, 391 Mass. 377, 382 (1984). The photograph showing one wound four inches inside the vagina

was also relevant to the issue of the defendant's guilt since the wound matched the length of the knife found in the defendant's truck.

At trial, the judge held a bench conference and listened to the defense attorney's objections regarding the introduction of the photographs. The judge correctly noted that the photographs were relevant to whether the murder was committed with extreme atrocity or cruelty. The judge then instructed the jurors to be "cold, calculating and professional in dealing with this type of evidence" and not to "get fired up." There was no abuse of discretion by the judge.

5. *Prosecutor asking defendant to comment on the credibility of witnesses.* The defendant argued that the prosecutor pursued an improper line of questioning which placed the defendant in a credibility contest with other witnesses. Since the defendant did not object to the questions, we review the allegations only to determine (if there is error) whether there is a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Parham*, 390 Mass. 833, 841 (1984). We conclude that there was no such risk.[4]

Although the prosecutor in this case asked the defendant whether he agreed with the facts testified to by other witnesses, the questioning was unlike that in *Commonwealth* v. *Long*, 17 Mass. App. Ct. 707 (1984). There, the prosecutor asked the defendant questions concerning the credibility of witnesses at trial and misstated previous testimony of witnesses. *Id.* at 708, 709. The questions are also readily distinguishable from those posited in *Commonwealth* v. *Triplett*, 398 Mass. 561 (1986). In that case, the defendant was repeatedly asked whether the Commonwealth's eyewitness, the defendant's mother, was

---

[4] Two examples of these questions follow:

"Q. You heard Sgt. Beacon say that all you said was Chris?

A. Yes.

Q. So that's not entirely correct?

A. That's true, yes."

and; "Q. So you are testifying that the police are incorrect when they say they found the knife underneath the driver's seat?

A. No. I said I wasn't aware that it was underneath the driver's seat."

"correct" in her testimony which bore on the central issue of the case, i.e., whether the defendant acted in self-defense or with deliberate premeditation. *Id.* at 567. We conclude that the questions posed to the defendant in this case did not create an issue of credibility between the defendant and other witnesses. Accordingly, there was no error.

6. *Publicity.* The defendant moved for a mistrial, alleging that a prejudicial article had appeared in a local newspaper on February 26, 1983. After a hearing, the motion was denied. The article reported that "[t]he detective said Richenburg mentioned the apparent need for a lawyer . . . ." The detective's statement had been excluded from the testimony presented to the jury.

On the basis of the defendant's motion, the judge reminded the jurors that he had ordered them on a daily basis to avoid reading articles dealing with the trial. The judge then collectively questioned the jury to determine whether the jurors had heard of or read the article. No juror acknowledged reading the article. The judge did not abuse his discretion in refusing to declare a mistrial. It is only when a judge finds that a juror has been exposed to potentially prejudicial material that the judge must individually poll the jurors. *Commonwealth* v. *Jackson*, 376 Mass. 790, 799 (1978). Here, the judge was entitled to rely on the jury's negative response to his questions. *Commonwealth* v. *Palmariello*, 392 Mass. 126, 139-142 (1984).

7. *Prosecutor's closing argument.* The defendant challenges one portion of the closing argument where the prosecutor argued that the victim may have been tied to a support column in the basement. The defendant moved for a mistrial on the basis of the remarks, arguing that they were prejudicial and without foundation. The motion was denied. The prosecutor contends that his comment was solidly grounded on reasonable inferences from the evidence. The evidence at trial included a rope mark on the victim's right bicep as well as an eight-foot length of rope knotted tightly on her throat. There was also a sixteen-inch length of rope found on the cellar floor.

We begin with the proposition that counsel may argue the evidence, and any reasonable inferences to be drawn therefrom, to the jury. *Commonwealth* v. *Lamrini*, 392 Mass. 427, 431 (1984). He may properly aid the jury in evaluating and applying evidence. Here, however, the prosecutor's remarks appear to go beyond the scope of the evidence. While there was evidence at trial concerning ropes, it was not sufficient to permit the inference that the victim had been tied to a column. That portion of the prosecutor's summation was arguably overreaching. However, it did not rise to a level requiring reversal. We note that the comment must be viewed in conjunction with the judge's forceful charge that the attorneys' closing arguments were merely theories, not evidence.

8. *Trial judge's refusal to allow the deliberating jury to examine the transcript of a witness' testimony.* For the first time on appeal, the defendant challenges the judge's refusal to allow the jury to review portions of the pathologist's testimony concerning a leaf found in the trash bag with the victim's body. In response to the jury's request, the judge replied, "Regretfully, no." The defendant argues that the judge did not seem to understand that he had the discretion to grant the jury's request. Alternatively, the defendant insists that if the judge was cognizant of his power, he abused his discretion. We must determine whether the refusal was an abuse of discretion, and if so, whether it created a substantial likelihood of a miscarriage of justice.

A judge has discretion to determine whether to allow the examination of a transcript of a witness's testimony upon request by the deliberating jury. *Commonwealth* v. *Bianco*, 388 Mass. 358, 370 (1983). See, for approval of a judge's refusal, *Commonwealth* v. *Horn*, 23 Mass. App. Ct. 319, 325 (1987); *Commonwealth* v. *Hunter*, 18 Mass. App. Ct. 217, 224 (1984); *Commonwealth* v. *Fitzpatrick*, 18 Mass. App. Ct. 106, 109 (1984). It is entirely appropriate that resolution of ambiguities regarding a witness's testimony be left to the recollection of the jury. *Commonwealth* v. *Fitzpatrick, supra.*

We find no indication that the judge was unaware of his discretion in this matter. The record reflects that he preferred

that the jury's collective memory should govern the outcome of any controversy concerning a leaf or leaves. We therefore conclude that the judge acted within his discretion in refusing the jury's request.

9. *Examination under G. L. c. 278, § 33E.* After reviewing the case in its entirety, we rule that the verdict was supported by the evidence and conclude that there has been no miscarriage of justice. Accordingly, we decline to grant relief under § 33E.

*Judgments affirmed.*