COMMONWEALTH *vs.* FRANK LAWRENCE.

Norfolk. December 6, 1988. — March 20, 1989.

Present: HENNESSEY, C.J., ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Homicide. Common Law. Practice, Criminal,* Grand jury proceedings, Examination of jurors, Plea, Argument by prosecutor, Reopening of evidence, Instructions to jury, Voluntariness of statement. *Evidence,* Admissions and confessions, Exculpatory, Photograph, Consciousness of guilt. *Constitutional Law,* Admissions and confessions. *Probable Cause. Intoxication. Malice.*

The court's holding in *Commonwealth* v. *Cass,* 392 Mass. 799 (1984), gave notice that, after the date of that decision, criminal liability would attach to the unlawful killing of a viable fetus. [383-384] ABRAMS, J., concurring.

In a murder case, where the grand jury heard ample evidence to establish the defendant's identity and to establish probable cause for his arrest, the defendant's motion to dismiss the indictments was correctly denied. [384-385]

The judge who heard a motion to suppress a criminal defendant's statements correctly concluded that the defendant voluntarily, knowingly and intelligently waived his constitutional rights before making the statements, which provided probable cause for his arrest. [385-387]

At a criminal trial the judge properly exercised his discretion to exclude evidence of crimes committed by others, offered to show that a person other than the defendant committed the crimes charged, where the judge was warranted in concluding that the other offenses were too remote in time and too dissimilar factually, in relation to the crimes charged, to have probative value. [387-388]

The record of a murder case, tried more than one year before this court's prospective rule announced in *Commonwealth* v. *Young,* 401 Mass. 390 (1987), did not demonstrate that the defendant was entitled to an individual voir dire of jurors on the issue of racial bias. [388]

In a first degree murder case in which the defendant never explicitly stated that he was willing to offer an *"Alford"* plea there was no merit to his contention that he had a right to have such a plea accepted. [388-389]

There was no error at a murder trial in the judge's admission of photographs depicting one victim's body, as it appeared when discovered, and an autopsy photograph of the other victim's body. [389-390]

The evidence at a murder trial was sufficient to prove that the victim's death was a homicide, that it was the defendant who killed the victim and her fetus, and that the killer knew the victim was pregnant. [390-391]

Nothing in the prosecutor's closing argument at a first degree murder trial warranted reversal of the defendant's conviction. [391-393]

In the circumstances of a criminal trial, the refusal of the judge to allow the defendant to reopen his case in order to present an additional witness, after the closing arguments but before the charge to the jury, did not infringe the defendant's right to present witnesses in his own behalf. [393]

At a murder trial the judge's instructions to the jury, viewed in their entirety, with respect to consciousness of guilt, extreme atrocity or cruelty, and burden of proof were proper; other aspects of the instructions created no substantial likelihood of a miscarriage of justice. [393-397]

INDICTMENTS found and returned in the Superior Court Department on October 21, 1985.

Pretrial motions were heard by *John J. Irwin, Jr.*, J.; *Charles M. Grabau*, J.; and *James F. McHugh*, J. The cases were tried before *Robert Malcolm Graham*, J.

*Kevin J. Reddington* for the defendant.

*Stephanie Martin Glennon*, Assistant District Attorney, for the Commonwealth.

LYNCH, J. On December 16, 1986, a jury convicted the defendant, Frank Lawrence, of murder in the first degree of a sixteen year old girl (victim). The defendant was also convicted of the involuntary manslaughter of the twenty-seven week old male fetus that the victim was carrying. He was sentenced to the mandatory life sentence on the murder conviction and to a term of from eight to ten years on the involuntary manslaughter conviction to be served from and after the life sentence.

In challenging his convictions,[1] the defendant contends that there was error in the denial of his motion to dismiss the

---

[1] We recognize that, because the defendant was convicted of the lesser crime of involuntary manslaughter in the death of the fetus, a direct appeal under G. L. c. 278, § 33E (1986 ed.), does not lie. However, in the interests of judicial efficiency, and because most of the issues raised on appeal relate to both convictions, we will not bifurcate the appeals and thus we decide

indictment charging murder of the fetus and in the ruling that a viable fetus was a human being for purposes of common law homicide; there was error in the denial of his motion to dismiss the indictments because the evidence submitted to the grand jury was insufficient as a matter of law; it was error to deny his motion to suppress statements he made during the execution of a search warrant at his apartment; it was error to exclude proffered "third-party culprit" evidence; he was denied a fair trial due to the trial judge's failure to conduct a voir dire of each prospective juror; it was an abuse of discretion for the trial judge to refuse to accept an *Alford*[2] plea to a reduced charge; that certain photographs were improperly allowed in evidence; his motion for required findings of not guilty should have been allowed; parts of the prosecutor's closing argument were improper; the judge erred in refusing to permit the defendant to reopen his case after closing argument; and several aspects of the judge's jury charge were in error. Finally in regard to the conviction of murder in the first degree, the defendant claims that the combined effect of the alleged errors warrants either reversal, a new trial, or a reduction in the degree of guilt pursuant to our review power under G. L. c. 278, § 33E (1986 ed.). It is apparent from this recitation that the defendant's claims of error are numerous. His brief offers little support for this comprehensive attack on the proceedings below. The brief misconstrues the evidence, ignores or misapplies recent precedent of this court, and makes generalized claims of error where specific claims are required. In short, it would appear that the brief is a "cut and paste" creation constructed primarily from materials prepared for proceedings below. It does not meet the standards of this court. We nevertheless examine each of the defendant's claims. We reject each of the defendant's arguments and affirm the convictions.

the defendant's challenges to the manslaughter conviction along with his challenges to the murder conviction.

[2] *North Carolina* v. *Alford*, 400 U.S. 25 (1970). In *Alford*, the United States Supreme Court held that, in certain circumstances, a defendant's plea of guilty is constitutional even though the defendant "is unwilling . . . to admit his participation in the acts constituting the crime." *Id.* at 37.

We state as much of the evidence as is necessary to understand the defendant's principal claims. On September 25, 1985, a worker on the roof of a single-story commercial building in an industrial park in Stoughton noticed the victim's body on the ground ten feet from the building. The worker telephoned the Stoughton police, who responded. The police observed a badly decomposed body, face down, with the victim's wrists bound together beneath the body and with the buttocks bruised in what appeared to be geometric patterns.

Items found at the scene included the following: a pocketbook; a pink sweater; a jacket; a white cord; a pierced earring; a leather belt with geometric patterns; a brown knife case or sheath; a blue and red cloth wallet; and a ballpoint pen. Two unused condom packages and one empty condom package were found in the jacket pockets. The wallet contained a driver's license and other identification belonging to the defendant.

Doctor Donald Suarez, an associate medical examiner, performed the autopsies. He testified that he identified the sixteen year old victim through dental records. He was of the opinion that the belt found at the scene caused the bruising on the victim's buttocks. He testified that a full body X-ray revealed no metal or other foreign material inside the victim's body. Examination of other organs showed no evidence of injury or disease. He also testified that the victim was pregnant, and her abdomen was "quite distended" consistent with a gestation period of between twenty-seven and thirty weeks.

Due to the advanced decomposition, Dr. Suarez was unable to determine the exact cause of death. However, he opined that the death was a homicide, since there was no evidence that the death was suicide, accidental, or from natural causes. Although some traces of cocaine were found in the body, it was his opinion that neither the victim nor the fetus died as a result of a drug overdose. Dr. Suarez also testified that the high degree of decomposition in the victim's throat area could have been caused by the throat's having been cut. As to the fetus, he testified that the normally configured male weighed approximately two and one-half pounds and was of approximately twenty-seven weeks' gestation. He concluded that the

fetus was alive at the time of the victim's death, was viable, and died from a lack of oxygen as a result of the victim's death.[3]

The defendant's roommate testified that, when the defendant went out on September 20, he was wearing a knife in a sheath on his belt; that when he returned home at approximately 1:30 A.M. he appeared upset and said he had been robbed. At that time he had his knife but not his sheath. She also testified that the sheath found at the scene was similar to the one owned by the defendant.

The defendant called the local police department to report the robbery at about 3 A.M. The defendant told the responding police officer that his wallet and knife had been stolen. He related a rather improbable version of a robbery without mentioning the loss of his belt, pen, or sheath. The police officer told the defendant that he did not believe the story and to telephone later when he got his story straight.[4]

On September 27, 1985, police executed a search warrant at the defendant's apartment, where they seized a Klein brand knife in a black sheath from between the mattress and the box spring on the defendant's bed.[5] They also seized another knife from his bureau, and a pair of blood-stained corduroy pants.

A State forensic chemist testified that the stains inside the defendant's automobile and on the corduroy pants tested positive for type O human blood. The victim had type O blood. The defendant has type A blood.

---

[3] The victim's mother testified that she had last seen her daughter in July, and her pregnancy was apparent. She also testified that the victim was five feet tall and weighed approximately 110 to 115 pounds. The victim's mother also testified that the victim was healthy, in good spirits, and was getting ready to have the baby.

[4] Subsequently, the defendant called various credit companies to report the theft of his credit cards.

[5] A State police officer assigned to firearms identification testified that he conducted a microscopic examination of the knife seized from underneath the defendant's mattress and the sheath found near the victim's body. He opined that the marks found on the knife were consistent with the knife having been carried in the brown sheath found near the victim's body. He testified that the knife seized from the defendant's apartment also fit into the sheath it was in, but that sheath did not contain markings consistent with having carried the knife.

During the course of the search of his apartment, the defendant told the police that he had been at the Forest Spa in Brockton between 9 P.M. and 11 P.M. on Friday, September 20, and he related a somewhat different version of the robbery from that which he had previously given.

The defendant testified in his own behalf. He said that he visited two drinking establishments on September 20 and that sometime after midnight he was robbed. He testified that he was not in the area where the victim's body had been discovered and that he had not harmed the victim.

The defendant subpoenaed an individual whose telephone number was found on a slip of paper in a pocketbook found near the body. After closing arguments, the defendant moved to reopen his case, as the individual had responded to the subpoena. The defendant asserted that the testimony would be relevant because his investigation revealed that the witness worked in the same industrial park where the body had been found. The judge denied the defendant's motion to reopen.

PRETRIAL MOTIONS.

The defendant filed pretrial motions to dismiss the indictments, to suppress statements made to the police, and to determine the admissibility of third-party evidence. These motions were heard by different judges in the Superior Court.

1. *Motions to Dismiss the Indictments.*

a. *Homicide of a viable fetus.* The defendant filed a motion to dismiss the indictment charging him with the murder of the fetus, arguing that: (1) Massachusetts should not recognize a viable fetus as a human being for the purpose of the common law crime of murder, and (2) if the court rules that a viable fetus is considered a human being for purposes of common law murder, the ruling should not be applied retroactively. The defendant does not dispute that the fetus was viable.[6]

In *Commonwealth* v. *Cass*, 392 Mass. 799, 807 (1984), we held that the "infliction of prenatal injuries resulting in the

---

[6] Because there was no dispute concerning viability, we need not decide whether it is homicide to cause the death of a nonviable fetus. See *Commonwealth* v. *Cass*, 392 Mass. 799, 807 n.8 (1984).

death of a viable fetus, before or after it is born, is homicide."
Although the precise issue in *Cass* was whether a viable fetus
came within the meaning of the term "person" as it was used
in the motor vehicle homicide statute, G. L. c. 90, § 24G (*b*),
as appearing in St. 1982, c. 376, § 2, see *id.* at 800, our
reasoning in *Cass* rejected the ancient common law rule that
a person must be "born alive" in order to be protected by the
criminal law, and thus is equally applicable to the common
law crime of murder. There we recognized that the "dominant
rationale" for the ancient rule was the impossibility of ascertain-
ing whether "the fetus was alive when the accused committed
his act," *id.* at 806 & n.5, and rejected the rule because "[m]edi-
cal science now may provide competent proof as to whether
the fetus was alive at the time of a defendant's conduct and
whether his conduct was the cause of death." *Id.* at 806.

Given our decision in *Cass*, the defendant cannot claim that
he did not have warning that such conduct was prohibited.[7]
The defendant was put on notice "that our criminal law should
extend its protection to viable fetuses." *Id.* at 807.

b. *Insufficiency of the evidence presented to the grand jury.*[8]
The defendant claims that his motion to dismiss the indictments
was erroneously denied arguing that: (1) the evidence presented
to the grand jury did not rise to the level of probable cause to
arrest, and (2) even if it did, the level of proof presented to
the grand jury should be at least the same level as that required
at a probable cause hearing.

Our longstanding rule has been that a court will not review
the competency or sufficiency of the evidence before a grand
jury. *Commonwealth* v. *O'Dell*, 392 Mass. 445, 450 (1984),
and cases cited. We have departed from this general rule only
where the "integrity of the grand jury proceeding was im-
paired," *id.* at 446-447, or where there was no evidence suf-

---

[7] The *Cass* case was decided on August 16, 1984, and the date of the
defendant's alleged criminal conduct here was September 20, 1985.

[8] The record before us does not include the judge's order denying this
motion to dismiss. However, because both parties agree that the motion
was denied and because both parties have briefed and argued the appropriate-
ness of the denial, we address the issue as presented.

ficient to establish probable cause to arrest the defendant. *Commonwealth* v. *McCarthy*, 385 Mass. 160, 163 (1982). Here, it is sufficient to say that the grand jury heard ample evidence to establish the defendant's identity and to establish probable cause to arrest him.[9] There was no error in denying the defendant's motion to dismiss the indictments.

2. *Motion to suppress.* The defendant contends that his statements to Trooper Robert Murphy during the execution of the search warrant were the product of an illegal arrest and that he did not knowingly, intelligently, and voluntarily waive his constitutional rights.

After hearing evidence, the judge made the following findings of fact. On September 25, 1985, Trooper Murphy obtained a search warrant for the defendant's apartment. On September 27, 1985, at approximately 2:30 A.M., Murphy and two other detectives went to the defendant's apartment. The defendant came to the door and asked Murphy whether they had come about his wallet. Murphy said they had, and that the wallet had been found a few feet from a body discovered in Stoughton. At this point, the defendant was advised of his rights under *Miranda* v. *Arizona*, 384 U.S. 436 (1966).

---

[9] The grand jury heard testimony that the victim was found nude with her hands bound underneath her. A wallet containing the defendant's driver's license, as well as various credit cards in his name, was found. A search warrant was executed at the defendant's apartment, and the search yielded a pair of bloodstained corduroy pants and a Klein brand knife hidden under the defendant's mattress. The police also discovered numerous blood stains in the defendant's automobile.

The grand jurors also heard testimony regarding differing versions of the defendant's story of having been robbed by an unknown woman and man who jumped into his Triumph Spitfire automobile. They also heard testimony that, when the police asked the defendant about his knife and belt, he told them that the assailants took them, even though the belt and knife were not on his list of stolen items.

The medical examiner testified that he found no evidence that the victim died accidently, due to natural causes, or from suicide. He opined that the cause of death was homicide. The grand jury were also told that the victim was pregnant. The medical examiner opined that the twenty-seven week old fetus was viable and alive at the time of the victim's death and died of suffocation due to her death.

The defendant had no trouble walking and exhibited no signs that he had been drinking. The defendant appeared coherent and Murphy believed that the defendant understood his Miranda rights.

Murphy and the defendant spoke at the kitchen table while the other officers were searching the apartment. The defendant told Murphy how he had been robbed on September 20, 1985.

After the police seized a knife from underneath the defendant's mattress as well as some clothing, including corduroy pants which appeared to be bloodstained, Murphy believed he had probable cause to arrest the defendant. The defendant was then arrested and taken to the police station for booking.

The motion judge ruled that the police had probable cause to arrest the defendant based on his statements, the seizure of blood-stained corduroy pants, and the seizure of the Klein brand knife, which he claimed had been taken from him by the assailant. The judge also found that the questioning was not coercive, since it took place in the defendant's own kitchen, was of short duration, and was not threatening in manner or style. The judge also found that the defendant was not under the influence of any drugs or alcohol and appeared calm and oriented. Based on the "totality of circumstances," the judge concluded that "the defendant waived his rights voluntarily, knowingly and intelligently." Although the judge stated that the defendant's statements "were made freely and voluntarily while in *custody*," he found explicitly that the defendant was not placed under arrest until after the questioning took place (emphasis supplied). That misstatement does not require the conclusion that the defendant was "under arrest" when Murphy and the other officers arrived to execute the search warrant. The judge's subsidiary findings command the conclusion that the defendant was not under arrest during questioning. The fact that Murphy advised the defendant of his Miranda rights does not mandate the conclusion that the defendant was under arrest. *Commonwealth* v. *Parker*, 402 Mass. 333, 339 n.2 (1988). *Commonwealth* v. *Medeiros*, 395 Mass. 336, 345-346 (1985). *Commonwealth* v. *Alicea*, 376 Mass. 506, 513 (1978).

Cf. *Commonwealth* v. *Bryant*, 390 Mass. 729, 742 n.15 (1984).[10]

We also conclude that the judge's finding that the defendant voluntarily, knowingly, and intelligently waived his constitutional rights and the judge's ruling that the Commonwealth met its burden of proof were free of error.[11]

3. *Motion to admit third-party evidence*. "A defendant may introduce evidence that tends to show that another person committed the crime or had the motive, intent, and opportunity to commit it." *Commonwealth* v. *Harris*, 395 Mass. 296, 300 (1985). Evidence of other crimes, committed by another person, is admissible if they "are so closely connected in point of time and method of operation as to cast doubt upon the identification of [the] defendant as the person who committed the crime." *Id.*, quoting *Commonwealth* v. *Keizer*, 377 Mass. 264, 267 (1979). However, "[t]he evidence should not be too remote in time or too weak in probative quality, and it should be closely related to the facts of the case against the defendant." *Commonwealth* v. *Harris*, *supra*, quoting *Commonwealth* v. *Graziano*, 368 Mass. 325, 329-330 (1975). The judge has considerable discretion in determining whether the proffered evidence meets these conditions and thus whether to admit the evidence.[12]

---

[10] The judge's determination that Trooper Murphy had probable cause to arrest the defendant was amply supported by the evidence. Even a finding that an interrogation is "custodial" is not tantamount to a finding that the person being questioned was under arrest. See *Commonwealth* v. *Bryant*, 390 Mass. 729, 736-737 (1984).

[11] The defendant alludes to the issue of voluntariness in his argument regarding the validity of his waiver of his Miranda rights. However, the evidence submitted to the motion judge amply supports the conclusion that the defendant's statement to Murphy was voluntary. *Commonwealth* v. *Parker*, *supra* at 340-341. *Commonwealth* v. *Callahan*, 401 Mass. 627, 630-631 (1988). *Commonwealth* v. *Wills*, 398 Mass. 768, 775-777 (1986).

[12] The defendant raised the issue by means of a pretrial motion in limine rather than at trial because, if the evidence was deemed admissible, he could have the benefit of compulsory process to bring the prospective witnesses forward in sufficient time to testify. The Commonwealth did not object to this procedure.

The judge found that the proffered evidence did not meet the criteria for admissibility. The judge noted that "each of the 'third-party' offenses was committed at least a month after the offense for which [the] defendant is charged," and went into considerable detail in explicating the differences between the various crimes and the homicide in this case. We conclude that the judge did not abuse his discretion in excluding the proffered third-party evidence. See *Commonwealth* v. *Geraway*, 355 Mass. 433, 441 (1969); *Commonwealth* v. *Murphy*, 282 Mass. 593, 597-600 (1933). Cf. *Commonwealth* v. *Jewett*, 392 Mass. 558, 562-563 (1984).

TRIAL.

1. *Voir dire.* The defendant argues that a voir dire of each prospective juror was mandated by the difference in race between the defendant and the victim.[13] The defendant's argument that he was entitled to individual voir dire concerning racial prejudice because of our decision in *Commonwealth* v. *Young*, 401 Mass. 390 (1987), overlooks the fact that the *Young* case, decided more than one year after the defendant's trial, announced a prospective rule governing requests for voir dire concerning racial prejudice in murder cases. *Id.* at 398. As we stated in *Young*, "the mere fact that the defendant and the victim are of different races does not impose constitutionally mandated voir dire on the issue of race." *Id.* at 400. "Nothing in the record indicates that the defendant was a special target of racial bias, and the subject of racial prejudice was not at issue in the trial." *Id.*[14]

2. *Refusal of Alford plea.* The defendant contends that the trial judge abused his discretion by declining to entertain a guilty plea in the circumstances of *North Carolina* v. *Alford*, 400 U.S. 25 (1970). This argument fails because the record reflects that the discussions regarding a possible *Alford* plea were purely exploratory in nature.

---

[13] The victim was black and the defendant is white.

[14] The judge did inform the prospective jurors that the victim was black and was approximately seven months' pregnant and asked them if they were "aware of any bias or prejudice toward either the Commonwealth or the Defendant in this case."

The record discloses that the prosecutor was willing to go forward with a guilty plea to a reduced charge of murder in the second degree, but maintained his unwillingness to reduce the charge for purposes of an *Alford* plea.[15] The prosecutor maintained that the defendant should either admit his guilt or have his day in court.

At no time did the defendant explicitly state that he was willing to enter a guilty plea, but at the same time assert his innocence. In any case, there was no error since "there is no constitutional right to have the plea accepted. The matter is wholly discretionary with the judge." *Commonwealth* v. *Dilone*, 385 Mass. 281, 285 (1982) (no abuse of discretion to reject plea even if judge had practice of rejecting *Alford* pleas, where other judges would have accepted such pleas). Cf. *Commonwealth* v. *Watson*, 393 Mass. 297, 301 (1984); *Commonwealth* v. *Souza*, 390 Mass. 813, 820 (1984).

3. *Photographs*. The defendant complains that photographs depicting the victim's body as it appeared when it was discovered and an autopsy photograph of the fetus, which were introduced at trial, were prejudicial and thus denied him due process. The judge did not abuse his discretion in determining that the probative value of the photographs outweighed any prejudicial effect.

"The admissibility of photographic evidence is a matter left to the sound discretion of the judge, and the defendant bears a heavy burden of demonstrating abuse of that discretion." *Commonwealth* v. *Glowacki*, 398 Mass. 507, 512 (1986). See *Commonwealth* v. *Richenburg*, 401 Mass. 663, 672 (1988). The photographs depicting the naked victim with her hands bound beneath her, and showing that she suffered numerous bruises on her buttocks, were unquestionably relevant to the issue whether the victim had been killed with extreme atrocity or cruelty. See *Commonwealth* v. *Richenburg, supra; Com-*

---

[15] Apparently the prosecutor was willing to have the indictment charging murder of the fetus filed in return for the defendant's admission on the other indictment. It is well settled that prosecutors have substantial discretion in entering into and structuring plea negotiations. See *Commonwealth* v. *Smith*, 384 Mass. 519, 522 (1981).

*monwealth* v. *Benoit*, 389 Mass. 411, 429 (1983). The photographs were also relevant in assisting the jury with the medical examiner's testimony that, because of the decomposition, he could not establish a precise cause of death. *Commonwealth* v. *Nadworny*, 396 Mass. 319, 367 (1985), cert. denied, 477 U.S. 904 (1986). The photograph of the fetus was relevant to show its gestation and thus the physical appearance of the victim's pregnancy to a third party.

The judge conducted a voir dire, admitted photographs he found relevant and excluded the ones he found cumulative and possibly prejudicial, and instructed the jury that the photographs were to be used in analyzing the evidence and "are not designed to elicit any sympathy."[16] See *Commonwealth* v. *Richenburg, supra* at 673; *Commonwealth* v. *Nadworny, supra* at 367; *Commonwealth* v. *Sielicki*, 391 Mass. 377, 382 (1984). There was no abuse of discretion.

4. *Denial of motion for required findings.* The defendant argues that it was error for the trial judge to deny his motion for required findings of not guilty because the evidence was insufficient to prove cause of death, criminal agency, and the assailant's knowledge of the presence of the fetus. There was sufficient evidence on each issue to withstand the defendant's motion.

a. *Cause of death.* "The fact that the cause of death was not ascertainable from the body does not of itself preclude the Commonwealth from proving that the victim's death was by violence and the criminal agency of the defendant beyond a reasonable doubt." *Commonwealth* v. *Nadworny*, 396 Mass. 342, 354 (1985).

The defendant's contention that no reasonable trier of fact could find that a homicide occurred overlooks the fact that the medical examiner ruled out natural causes and opined that the victim died as a result of a homicide.

b. *Agency.* There was also sufficient evidence that it was the defendant who killed the victim and her fetus. Cf. *Common-*

---

[16] In his charge to the jury, the judge also instructed: "You are reminded that the pictures are not presented to generate emotion and sympathy for the victims but, rather, to assist you in determining the facts in this particular case."

*wealth* v. *Nadworny*, *supra* at 356. Evidence that the defendant's personal effects and identification were found near the body, that a blood-stained knife was seized from under his mattress, that a sheath matching that knife was found near the body, that clothing seized from his apartment was stained with blood which matched the victim's type, that there were traces of human blood on the interior of his automobile, and the differing versions of the alleged robbery the defendant told to his roommate and the police, warranted the jury verdicts.

c. *Fetus*. The defendant's argument that there was no evidence that the assailant knew the victim was pregnant is also without merit. The victim, who was five feet tall and weighed approximately 110 to 115 pounds, was in the third trimester of her pregnancy. The medical examiner testified that her abdomen was quite distended, and at the time the fetus weighed approximately two and one-half pounds. This, coupled with the fact that she was found naked with her hands bound in front of her, supports the reasonable inference that her killer was cognizant of the pregnancy.

5. *The prosecutor's closing argument*. The defendant claims that various improprieties occurred during the prosecutor's closing argument. The defendant objected at trial that the prosecutor's allegation of sexual activity was not supported by the evidence; that it was improper to comment on the defense tactic of creating reasonable doubt by charging inadequate police investigation procedures; that it was improper for the prosecutor to comment on what constitutes reasonable doubt; and that it was improper to refer to jurors as the conscience of the community.[17] The defendant argues that the cumulative effect of these allegedly improper remarks warrants reversal.

"The rules governing prosecutors' closing arguments are clear in principle. We have never criticized a prosecutor for arguing forcefully for a conviction based on the evidence and on inferences that may reasonably be drawn from the evidence."

---

[17] Although the defendant made a timely objection to the prosecutor's closing argument, he did not request any curative instructions on any of the remarks he now claims warrant reversal. See *Commonwealth* v. *Habarek*, 402 Mass. 105, 110-111 & n.2 (1988).

*Commonwealth* v. *Pontes*, 402 Mass. 311, 315 (1988), quoting *Commonwealth* v. *Kozec*, 399 Mass. 514, 516 (1987). "In analyzing a claim of improper argument, the prosecutor's remarks must be viewed in light of the 'entire argument, as well as in light of the judge's instruction to the jury and the evidence at trial.'" *Commonwealth* v. *Lamrini*, 392 Mass. 427, 432 (1984), quoting *Commonwealth* v. *Bourgeois*, 391 Mass. 869, 885 (1984). See *Commonwealth* v. *Pontes, supra* at 316; *Commonwealth* v. *Dougan*, 377 Mass. 303, 312 (1979). Applying these principles, we conclude that the remarks do not warrant reversal.

The evidence warranted the inference that the defendant engaged in sexual activity with the victim as well as having committed "bizarre acts." The defendant's wallet, pen, and belt were at the murder scene and the victim was found nude. Thus it could be inferred that the assailant took off his pants in order to engage in sexual activity with the victim and that his personal items fell out of his pockets. The prosecutor's remarks also explained the bruises on the victim's buttocks which the medical examiner opined were consistent with the pattern on the belt found at the scene. The fact that an empty condom package was found in the pocket of the jacket found next to a nude body also supports an inference that sexual activity may have occurred. See *Commonwealth* v. *Corriveau*, 396 Mass. 319, 337 (1985). Contrast *Commonwealth* v. *Kozec, supra* at 524.

The essence of the prosecutor's remarks concerning the defense's trial tactics was "that the defendant was trying to confuse and distract the jury by diverting their attention away from the strong evidence of his guilt." *Commonwealth* v. *Shea*, 401 Mass. 731, 739 (1988). Indeed, the prosecutor conceded that perhaps the police should have done more, but suggested that the lack of a perfect case did not preclude convictions. In addition, the jury were explicitly instructed that they could consider the failure to produce or preserve relevant evidence or to conduct tests, "as raising a reasonable doubt regarding the Defendant's guilt."

The defendant's claim that the prosecutor's reference to the jury as the "conscience of the community" and his comment regarding what constitutes reasonable doubt were improper is also without merit. Because the jury had to assess whether the killing occurred with extreme atrocity or cruelty, they did speak as representatives of the community's conscience. See *Commonwealth* v. *Atkins*, 386 Mass. 593, 600-601 (1982). The defendant's brief does not identify any misstatement by the prosecutor regarding what constitutes reasonable doubt, or how the prosecutor's comments may have "trivialized and misstated the Commonwealth's burden of proof." See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975). In any event, the prosecutor's remarks complied with the long-standing definition of what constitutes reasonable doubt contained in *Commonwealth* v. *Webster*, 5 Cush. 295, 320 (1850).

6. *Reopening case.* We also find that the judge's refusal to allow the defendant to reopen his case after closing arguments but prior to the jury charge in order to present an additional witness did not violate the defendant's constitutional right to present witnesses in his own behalf.

In requesting leave to reopen his case, the defendant told the trial judge that the individual could testify that "he had been on Spring Street in Brockton," and "that he could have given his name to a prostitute," but "that he had never given his name to a pregnant woman."

A defendant's constitutional right to call witnesses is not absolute. *Commonwealth* v. *Blaikie*, 375 Mass. 601, 610 (1978). The judge's refusal to reopen the case to hear a witness, who did not know the victim, and who could not recall any details concerning the time or date he had been on Spring Street, did not interfere with the defendant's ability to establish a defense. *Id.* There was no error.

7. *Jury instructions.* The defendant mounts an attack on the judge's charge that is mostly theoretical, bearing scant relationship to the actual proceedings in this case. He claims that the instructions (a) shifted the burden of proof on the issue of inferences, (b) failed to include a requested instruction that the Commonwealth must prove specific intent on the matter

of extreme atrocity or cruelty, (c) failed to include a requested instruction on voluntary intoxication, (d) shifted the burden of proof on the issue of malice, (e) failed to include a requested instruction regarding proof of two equally inconsistent propositions, (f) included an improper charge on consciousness of guilt, and (g) failed to include a requested instruction on voluntariness of statements. In reviewing the judge's charge we note that "the adequacy of instructions must be determined in light of their over-all impact on the jury." *Commonwealth* v. *Callahan*, 401 Mass. 627, 631 (1988), quoting *Commonwealth* v. *Sellon*, 380 Mass. 220, 231-232 (1980). Because the alleged errors regarding inferences, intoxication, malice, and voluntariness were not properly raised at trial, we review them pursuant to G. L. c. 278, § 33E, solely to determine whether there was a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Callahan, supra.* After reviewing the charge in its entirety, we find that the judge's instructions regarding consciousness of guilt, extreme atrocity or cruelty, and burden of proof were proper, and the other aspects of the instructions do not create a substantial likelihood of a miscarriage of justice.

a. *Inferences.* The defendant argues that the judge should have instructed the jury that, in order to draw inferences, the Commonwealth must prove the subsidiary facts beyond a reasonable doubt. No such instruction was required. "[T]he evidence and the inferences permitted to be drawn therefrom must be 'of sufficient force to bring minds of ordinary intelligence and sagacity to the persuasion of [guilt] beyond a reasonable doubt.'" *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979). Furthermore, the portion of the judge's charge which the defendant contends in his brief is erroneous states entirely correct propositions of law. *Commonwealth* v. *Corriveau*, 396 Mass. 319, 339-340 (1985). See *Commonwealth* v. *Nadworny*, 396 Mass. 342, 354-356 (1985).

b. *Extreme atrocity or cruelty.* The defendant argues that the jury should have been instructed that, in order to convict him of murder in the first degree on the theory of extreme atrocity or cruelty, the Commonwealth must prove that the defendant had the "subjective knowledge that his conduct was

cruel and atrocious." We expressly rejected such an argument in *Commonwealth* v. *Sinnott*, 399 Mass. 863, 879 (1987).

c. *Voluntary intoxication.* The requested charge regarding voluntary intoxication was not required because the Commonwealth is not required to prove beyond a reasonable doubt the absence of intoxication. *Commonwealth* v. *Sylvester*, 400 Mass. 334, 337-338 (1987). *Commonwealth* v. *Costello*, 392 Mass. 393, 404-405 (1984). Thus, the issue was "whether there was enough evidence of intoxication to require the judge, sua sponte, to instruct the jury on the effect of voluntary intoxication and whether the failure to instruct on voluntary intoxication resulted in a substantial likelihood of a miscarriage of justice." *Commonwealth* v. *Fano*, 400 Mass. 296, 306 (1987).

The "primary difficulty with the defendant's claim is that the defense was not one of intoxication. The defendant did not rely on intoxication as a mitigating factor at any point in the trial." *Commonwealth* v. *Fano, supra.* The defendant's trial strategy was that he had nothing to do with the killing. "Thus, there was no notice to the judge at any point that intoxication or the defendant's mental capacity was an issue." *Id.* Furthermore, there was little evidence of the defendant's being intoxicated at the time of the offense, and thus "there was no error, much less a substantial likelihood of a miscarriage of justice, because the judge did not instruct on this issue." *Id.* at 307-308.[18]

d. *Malice.* We have reviewed the judge's malice instruction and conclude that, if the judge was imprecise in any way, certainly there was no substantial likelihood of a miscarriage of justice. The judge's reference to the fact that malice may be inferred from an "intentional use of a deadly weapon or where a victim is bound or repeatedly beaten" was not improper. See *Commonwealth* v. *Nadworny, supra* at 358; *Commonwealth* v. *Albert*, 391 Mass. 853, 859-860 (1984).

---

[18] This case does not involve a situation where the judge's instruction foreclosed the jury from considering evidence of intoxication. See, e.g., *Commonwealth* v. *Parker*, 402 Mass. 333, 336-337 (1988); *Commonwealth* v. *Glass*, 401 Mass. 799, 809-810 (1988); *Commonwealth* v. *Tevenal*, 401 Mass. 225, 230-231 (1987); *Commonwealth* v. *Fano*, 400 Mass. 296, 305-307 (1987).

e. *Equally inconsistent propositions.* The defendant's argument that it was error for the judge not to instruct the jury "that equally inconsistent propositions arising out of evidence presented in a criminal trial do not constitute proof of either" is without merit since the defendant does not identify any evidence that gives rise to two equally inconsistent propositions, one of which is compatible with innocence. See Mass. R. A. P. 16 (a) (4). The judge's instructions regarding the defendant's presumed innocence and the Commonwealth's exclusive burden of proof covered the substance of the requested charge. See *Commonwealth* v. *Wills,* 398 Mass. 768, 779-780 (1986).

f. *Consciousness of guilt.* In *Commonwealth* v. *Toney,* 385 Mass. 575, 585 (1982), we indicated that, in regard to a consciousness of guilt instruction the "judge should instruct the jury (1) that they are not to convict a defendant on the basis of evidence of flight or concealment alone . . . and (2) that they may, but need not, consider such evidence as one of the factors tending to prove the guilt of the defendant" (citation omitted). The judge's instructions [19] regarding false statements and concealment as evidence of consciousness of guilt satisfied in substance, if not explicitly, both prongs of *Toney.* See *Commonwealth* v. *Lapointe,* 402 Mass. 321, 330 (1988); *Commonwealth* v. *Nadworny, supra* at 370-371. There was no error.

g. *Voluntariness.* The defendant argues that the judge erred when he failed to charge the jury that they must disregard any out-of-court statement imputed to the defendant unless the

---

[19] The judge instructed the jury: "Let me touch briefly on one other thing. There has been mention made of evidence of a type that the law calls consciousness of guilt. In this case, we're talking about false statements that are made knowingly, and concealment of a knife. Now, this action may give rise to an implied admission of consciousness of guilt. However, such actions may be prompted by something other than feelings of guilt. Moreover, feelings of guilt may be present in innocent people. You may, but need not consider such evidence as one of the factors tending to prove the guilt of the Defendant.

"Finally, evidence of consciousness of guilt standing alone is not sufficient to convict the Defendant, but it may be considered with other evidence to determine if the Defendant's guilt has been established beyond a reasonable doubt."

Commonwealth proves beyond a reasonable doubt that the statement was a product of a knowing, intelligent, and voluntary waiver of his rights. However, the defendant fails to point to any evidence which rendered the voluntariness of either his waiver or his statements a "live issue" at trial. See *Commonwealth* v. *Day,* 387 Mass. 915, 923 (1983); *Commonwealth* v. *Richmond,* 379 Mass. 557, 560-561 (1980). Without a proper request and without evidence indicating voluntariness as a live issue there was no substantial likelihood of a miscarriage of justice from the lack of instruction on the issue.

8. *Examination under G. L. c. 278, § 33E.* After reviewing the record in its entirety, we find that the verdict of murder in the first degree was supported by the evidence and conclude there has been no miscarriage of justice. Therefore, we decline to grant relief under § 33E.

CONCLUSION.

Accordingly, we affirm the conviction of murder in the first degree and also affirm the conviction of involuntary manslaughter. See note 1, *supra.*

*Judgments affirmed.*


ABRAMS, J. (concurring). I continue to adhere to the views expressed by the dissent in *Commonwealth* v. *Cass,* 392 Mass. 799, 808 (1984). "The question whether the killing of a viable fetus [in the present circumstances] should be a separate crime is for the Legislature as a matter of wise social policy," *id.* at 809 (Wilkins, J., dissenting), subject to the constitutional limitations that this court and the United States Supreme Court have set. "The public policy of the Commonwealth in the creation of crimes is not for this court to determine, but for the Legislature." *Commonwealth* v. *Corbett,* 307 Mass. 7, 8 (1940). Nevertheless, the *Cass* case is the law of this Commonwealth.[1] I therefore concur.

---

[1] As far as I can determine, South Carolina is the only other State which has extended by case law the definition of homicide to include a viable fetus. See *State* v. *Horne,* 282 S.C. 444 (1984). Compare *Keeler* v. *Superior*

Commonwealth *v.* Lawrence.

The defendant makes three arguments with respect to his conviction for the death of the fetus. First, he argues that Massachusetts law does not recognize a fetus as a human being for purposes of construing the common law crime of murder. This argument is clearly incorrect in light of *Cass*, which addressed not only the vehicular homicide statute but also the common law. See *Cass*, *supra* at 807. Second, the defendant argues that, if the court is to make feticide punishable as homicide, it should do so only prospectively because the law gave the perpetrator insufficient notice that such conduct was forbidden. This argument is similarly without merit, as *Cass* gave ample notice that there would thenceforth be criminal liability for feticide in these circumstances. Third, the defendant argues that *Roe* v. *Wade*, 410 U.S. 113 (1973), precludes a determination that a fetus is a human being for purposes of common law murder.

This case, as well as *Cass*, criminalizes acts of violence perpetrated against the mother. The defendant cannot claim that his acts were performed for health reasons or that they were the result of a medical or personal decision by a pregnant woman. Thus, the acts of violence in murdering the pregnant woman are not acts protected by constitutional or statutory law.[2] Further, even in the context of clinical abortion, in which the mother's right of privacy is implicated, *Roe* v. *Wade* permits a State to proscribe abortion after the third trimester except when the mother's life or health is in danger. *Id.* at 164-165. Thus, *Roe* v. *Wade* does not support the defendant's contention

*Court*, 2 Cal. 3d 619 (1970); *State* v. *McCall*, 458 So. 2d 875 (Fla. Dist. Ct. App. 1984); *People* v. *Greer*, 79 Ill. 2d 103 (1980); *Hollis* v. *Commonwealth*, 652 S.W.2d 61 (Ky. 1983); *State* v. *Gyles*, 313 So. 2d 799 (La. 1975); *State* v. *Soto*, 378 N.W.2d 625 (Minn. 1985); *State ex rel. Atkinson* v. *Wilson*,      W.Va.      (1984) (332 S.E.2d 807 [W.Va. 1984]).

[2] This case does not implicate a woman's constitutional right of privacy or her constitutional right to terminate a pregnancy pursuant to *Roe* v. *Wade*, 410 U.S. 113 (1973). *Roe* is an integral part of our jurisprudence. See *Moe* v. *Secretary of Admin. & Fin.*, 382 Mass. 629, 647 (1981). This case does not involve an intrusion by the State into the doctor/patient relationship. See *Akron* v. *Akron Center for Reproductive Health, Inc.*, 462 U.S. 416 (1983). *Cass* correctly recognized that there are Federal and State constitutional limitations in extending criminal statutes. See *id.* at 807 n.11.

that in these circumstances the death of a viable fetus caused by murdering the mother may not be punished as a crime.

This is a relatively easy case in which to impose criminal liability because the defendant concedes that the fetus was viable, and does not argue that the perpetrator was unaware that the victim was pregnant. Thus, the court need not and does not discuss a scienter requirement with respect to the finding of viability. In other cases, that issue may arise in a constitutional framework. See *Colautti* v. *Franklin,* 439 U.S. 379, 390 (1979).

The court's decision does not make clear what one must know, or should know, about the pregnancy, the condition of the fetus, and viability at the time of the acts of violence. See *Colautti* v. *Franklin, supra*; *Hollis* v. *Commonwealth,* 652 S.W.2d 61, 64 (Ky. 1983). The mental element needed for conviction of murder cannot depend on a medical determination that can only be made by experts after the fact. The focus of a criminal trial must be on the defendant's mental state, not the victim's physical condition. Such issues, however, are not before us in this case. They await a case-by-case determination.